Robert Anthony REED, III, et al., Plaintiffs,

v.

James A. RHODES et al., Defendants.

No. C73–1300.

United States District Court,
N. D. Ohio, E. D.

Feb. 6, 1978.

James L. Hardiman, Cleveland, Ohio, Nathaniel R. Jones, Gen. Counsel, NAACP, New York City, Thomas I. Atkins, Roxbury, Mass., for plaintiffs.

Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, Ohio State Bd. of Ed., Martin W. Essex, Ohio Dept. of Ed., George I. Meisel, Charles F. Clarke, Wm. C. Hartman, James P. Murphy of Squire, Sanders & Dempsey, John H. Bustamante, Cleveland City Bd. of Ed., Cleveland, Ohio, for defendants.

## REMAND OPINION

BATTISTI, Chief Judge.

On August 31, 1976, this Court in a Memorandum Opinion and Order found

> that the Cleveland Board of Education and the State Board of Education, through their constituent members and their appointed Superintendents, have violated the plaintiffs' Fourteenth Amendment right to equal protection under the laws by intentionally fostering and maintaining a segregated school system within the Cleveland Public Schools.

*Reed v. Rhodes,* 422 F.Supp. 708 (N.D.Ohio 1976). The decision was certified for an interlocutory appeal, and the defendants, local and state school officials, sought and received permission from the Sixth Circuit Court of Appeals to prosecute an appeal.

On July 20, 1977, the United States Court of Appeals for the Sixth Circuit, without reversing, vacating, or staying the original August 31, 1976, decision, remanded the case to this Court to reconsider its findings of facts and conclusions of law in the light of *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), and other recent United States Supreme Court decisions. In its remand order, the Court of Appeals noted that the August 31, 1976 Opinion was "extensive and careful", but that this Court "lacked sufficient clairvoyance to anticipate fully the test language which the majority of the Supreme Court now has declared to be critical." In a footnote, the Court of Appeals suggested "specific identification, by labeling or numbering, of the Court's findings of fact and conclusions of law." In accordance with the remand of the Court of Appeals, this Court invited all parties to supplement the record with additional evidence. However, none chose to do so, concluding that the record as it existed was adequate.

This Court has carefully reviewed all the evidence and testimony in the record and has reconsidered its findings in light of *Dayton* and other recent decisions. Applying the standards of these decisions, this Court has determined that plaintiffs' evidence establishes numerous constitutional violations on the part of defendants; that defendants intended to and did in fact discriminate against plaintiffs by numerous acts and omissions, the purpose and effect of which were to foster and maintain a segregated dual school system; and that these numerous constitutional violations had systemwide impact entitling plaintiffs to a systemwide remedy.

The conclusion reached by the Court in this case is that both the City and State defendants are constitutionally liable for having maintained a *de jure* segregated public school system, consisting almost entirely of racially identifiable schools. To indicate how this conclusion was reached, the Court (1) will discuss the standards for liability established by recent Supreme Court decisions; (2) will comment on defendants' evidence; and (3) applying those standards, will detail the findings upon which defendants' liability depends.

In reconsidering its findings and conclusions, this Court means only to clarify what has gone before and not to substitute the present opinion for its earlier one. With this in mind, the Court has cited its earlier opinion, reported in 422 F.Supp. 708, whenever it has seemed appropriate or helpful. The findings reported herein are not new. In some instances, however, where the original decision left doubt as to a particular finding (of purpose, for example) the Court reviewed the supporting evidence with special care so that a more definite statement could be incorporated into this opinion.

### I.

In keeping with the request of the Sixth Circuit Court of Appeals, the Court here considers the recent Supreme Court decisions in *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), and *Brennan v. Armstrong,* 433 U.S. 672, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977), along with *School District of Omaha v. United States,* 433 U.S. 667, 97 S.Ct. 2905, 53 L.Ed.2d 1039 (1977), to determine the significance of these decisions for this case.

The Supreme Court made clear in *Dayton* that federal courts have the authority to grant broad relief of the kind ordered in this case when systemwide constitutional violations on the part of the school officials are proven. In doing so, the Court was merely reaffirming well-settled general principles governing equitable remedy. These principles were summarized most recently by the Supreme Court in *Milliken v. Bradley,* 433 U.S. 267, at 270, 97 S.Ct. 2749, 53 L.Ed.2d 745 at 4877 (1977). In this second *Milliken* case, the Supreme Court emphasized that the nature of any desegre-

gation remedy is to be determined by the nature and scope of the constitutional violation; the remedy must be related to the condition that offends the constitution, and the remedy must be designed to restore the victims of discrimination to the position they would have occupied in the absence of such discrimination. The *Milliken* decision also makes clear that these remedial considerations apply in school districts segregated by intentional school board action as well as those segregated by statute. *Dayton* adopts these principles and indicates that the proper approach to a remedy in a school desegregation case requires the court to determine the consequence of defendant's constitutional violation and then "fashion a remedy in the light of the rule laid down in *Swann, supra,* and elaborated upon in *Hills v. Gautreaux,* 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976)." 433 U.S., at 415, 97 S.Ct., at 2775. In this case, the consequence of defendants' constitutional violations was the establishment of a dual school system which was the constitutional equivalent of a legally mandated system of segregation warranting a comprehensive systemwide remedy.

██ The evidence in the Cleveland school case made out a prima facie case of *de jure* segregation according to the guidelines set forth in *Keyes v. School District No. 1, Denver, Colo.,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). The proofs presented to the Court disclosed that a substantial portion of the students, teachers, and facilities had been intentionally segregated, and in the language of *Keyes,* it was necessary to conclude that there existed a predicate for a finding of the existence of a dual school system. *Keyes,* 413 U.S. at 201, 93 S.Ct. 2686. Plaintiffs were not required to prove *de jure* segregation as to each and every school and student in the system. 413 U.S. at 200, 93 S.Ct. 2686. Rather, once a prima facie case was established, defendants were required to overcome the presumption that the segregated schooling within the system was not adventitious. Defendants also had the burden of proving that segregation in other schools within the system was not the result of their intention-

ally segregative actions. *Cf. Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 270–71 n. 21, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

The defendants in this case were informed that plaintiffs' evidence, favorably construed, would constitute a prima facie case of *de jure* segregation (TR 2806). They failed either to discredit plaintiffs' proofs or to show that other segregated schooling did not result from their intentionally segregative acts. Therefore, the Court found defendants did not meet their burden of disproving the prima facie case of systemwide segregation. Absent such showing, there was "proof of state-imposed segregation in a substantial portion of the district (which would) suffice to support a finding by the trial court of the existence of a dual system." *Keyes, supra,* 413 U.S. at 203, 93 S.Ct. at 2695. The Supreme Court clearly makes *Keyes* relevant to the crucial matters of remedy by affirming that "if there has been a systemwide impact [there] may . . . be a systemwide remedy. *Keyes, supra,* at 312," 93 S.Ct. 2686. *Dayton, supra,* 433 U.S., at 415, 97 S.Ct., at 2775. Under *Dayton,* it would seem that defendants' failure to remove, by evidence at trial, any schools or geographic areas in Cleveland from the presumption, well supported by plaintiffs' case, that all were a part of one intentionally segregated system, entitles plaintiffs to a systemwide remedy.

The factual findings arising from trial disclose substantial and decisive differences between the Cleveland and *Dayton* cases. Although both school systems are *de facto* segregated in residentially segregated cities, Judge Rubin found no present segregative effect of the *Dayton* defendants' past intentional segregative actions. Rather, such segregation as exists in the Dayton schools today was held to be the result of housing patterns. The exact opposite is true in Cleveland. The intentionally segregative actions of the Cleveland defendants contributed to the present segregated housing patterns and have a continuing segregative effect on the schools of Cleveland.

In *Dayton*, the three "cumulative violations" found by the district court taken by themselves were simply not sufficient to support a comprehensive systemwide busing order. Despite proof that there existed a condition of segregation and that there had been three isolated instances of discriminatory or intentionally segregative behavior, the Dayton school officials were found, in effect, to be operating a unitary school system. In Cleveland, there is proof of over 200 separate instances of intentionally segregative behavior occurring in every part of the district at all grade levels, not only in the Central area, but in the Beehive, Southeast, Hough-Dunham, Glenville, Northeast, and Westside areas of Cleveland as well, establishing a longstanding pattern of purposeful segregation. The "segregative effect [of these acts] on racial distribution" extends chronologically and geographically throughout the district; to use the mathematical language of *Dayton*, the incremental effect is 100%. This proof of systemwide constitutional violations supports a finding that the Cleveland school officials are operating a dual school system, entitling plaintiffs to comprehensive, systemwide relief.

In *Brennan v. Armstrong*, 433 U.S. 672, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977), the district court had made various findings of segregative acts and appointed a Special Master to develop a comprehensive desegregation plan for the Milwaukee school district. The Court of Appeals registered its doubt concerning these findings. It saw an "unexplained hiatus between specific findings of fact and conclusory findings of segregated (sic) intent." Nonetheless, the Court of Appeals affirmed the lower court's findings as not clearly erroneous. The Supreme Court vacated and remanded the case for reconsideration in the light of *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and *Dayton*. The Supreme Court in its *per curiam* decision noted that neither the district court nor the Court of Appeals had addressed itself to the *Dayton* mandate. As in *Dayton*, the Supreme Court suggested that the violations established might be too narrow for the broad relief ordered. The Court's reference to *Arlington* indicates there may have been insufficient proof of intent accompanying the segregative acts of Milwaukee school officials to support the legal conclusion that they were intentionally operating a dual school system.

An overwhelming number of defendants' acts explored in the Cleveland case were purposefully and intentionally segregative within the meaning of *Arlington*. Intentionally segregative conduct pervaded the entire system in Cleveland, dictating the legal conclusion that defendants were purposefully operating a dual system. By finding that defendants' predictably segregative acts were not taken in pursuit of racially neutral policies, the Court eliminated any hiatus between its findings of fact and its conclusory findings that the segregative acts were accompanied by segregative intent. There being no "hiatus" here, *Brennan* does not preclude a broad systemwide desegregation plan.

In *School District of Omaha v. United States*, 433 U.S. 667, 97 S.Ct. 2905, 53 L.Ed.2d 1039 (1977), the weakness identified by the Supreme Court seems to be the inadequacy of proof of intent necessary to support the finding of the constitutional violations on which to base a comprehensive desegregation plan. The district court found the plaintiffs had not proved defendants' segregative behavior was purposeful. The Court of Appeals reviewed and accepted the factual conclusions of the lower court, but applied its own test for purpose that relied on a presumption of intent arising from acts whose natural, probable, and foreseeable consequences would bring about segregation. Under this test, the Court of Appeals found that the defendants had not rebutted the presumption of intent. The Supreme Court in a *per curiam* decision vacated and remanded, again requiring a reconsideration in the light of *Arlington* and *Dayton*. The Supreme Court seems to be saying, as it did in *Dayton*, that (1) the trial court, not the appellate court, must make the necessary determinations of fact

and law, and (2) both courts must rest the determination of purposeful segregation on more than a presumption arising from proof of segregative consequences.

In the Cleveland case, however, this Court, consistent with *Arlington's* guidelines, found over 200 segregative acts, the great bulk of which were proved to be intentional by independent evidence and not through use of a presumption arising from segregative effects alone. Thus, the *Omaha* decision does not appear to limit this Court's authority to order a comprehensive remedy.

In short, a review of these recent decisions leads to precisely the same decision reached in August of 1976. The defendants Cleveland and State Boards of Education are guilty of intentionally segregating all faculty and all schools in the Cleveland system to produce a purposeful, systemwide violation. Their actions impacted on every school in the system by racially identifying every school and by signaling to all residents, black and white, which schools were theirs.

The Court makes the following determinations to support its finding of *de jure* segregation: First, the Cleveland public schools are presently segregated. Second, since 1940, the City and State defendants and their predecessors have engaged in numerous acts and omissions which were purposefully and intentionally segregative. Third, these purposefully and intentionally segregative acts and omissions were substantial causal factors in bringing about the present systemwide condition of segregation in the Cleveland public schools.

In respect to the first determination, the defendants did not challenge plaintiffs' charge that the school system is in fact segregated. In 1973, the District maintained 170 regular elementary, junior high, and senior high schools for its pupils, approximately 57% of whom were black. Of these 170 schools, 67 had student populations which were 90–100% white and 83 had student populations which were 90–100% black. Moreover, approximately 92% of all black students in the system attended one or another of these 83 virtually all-black schools. Defendants have conceded the existence of systemwide segregation in the Cleveland School District.

In making its second and third determinations, that defendants engaged in numerous acts and omissions which were purposefully or intentionally segregative, and that these acts or omissions were substantial causal factors in bringing about the present systemwide segregation in the Cleveland public schools, the Court has been guided by the following principles. Proof of segregative purpose or intent is essential in a *de jure* school desegregation case. Although proof of segregative effects is clearly relevant in ascertaining segregative purpose, proof of segregative effects, without more, does not usually constitute proof of segregative purpose. However, where an unmistakable pattern of segregative effects exists and cannot be explained on other than a racial basis, segregative purpose may be inferred. The Court has proceeded on the theory that if school officials engage in actions the natural, probable, and foreseeable consequences of which are segregative *and* if these actions are not applications of racially neutral policies, then the inference may be drawn that such actions were performed with the purpose or intent to segregate. Moreover, where a purposeful pattern of segregation has developed over time, *de jure* segregation exists despite the fact that individual official actions, when considered alone, may not have been purposefully segregative.

These principles find support in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). In *Arlington*, the Supreme Court suggested the kinds of evidence available to courts seeking to determine whether invidious discriminatory purpose might underlie official action. The Supreme Court noted that on occasion evidence of a "clear pattern unexplainable on grounds other than race" emerging from official action might establish purpose. In our case, the segregative

pattern of literally hundreds of incidents, unexplainable on grounds other than race, appears to be such an occasion.

More importantly, *Arlington* suggests that a finding of discriminatory purpose might rest on evidence that in making a decision officials had ignored factors usually considered important and had made a decision contrary to the one which would have resulted had they applied these factors. This guideline is essentially the principle followed by this Court which permits the inference of purpose where foreseeably segregative actions are not applications of racially neutral policies.

Plaintiffs' evidence fully supports the Court's determination that defendants have engaged in numerous actions which were purposefully and intentionally segregative, in that the actions' natural, probable, and foreseeable consequences were segregative *and* were not applications of racially neutral policies. In respect to this determination, the Court's approach reflects the holding of the Supreme Court in *Keyes v. School District No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). In *Keyes*, the Supreme Court held

> that a finding of intentionally segregative school board actions in a meaningful portion of a school system, as in this case, creates a presumption that other segregated schooling within the system is not adventitious. It establishes, in other words, a prima facie case of unlawful segregative design on the part of school authorities, and shifts to those authorities the burden of proving that other segregated schools within the system are not also the result of intentionally segregative actions.

413 U.S. at 208, 93 S.Ct. at 2697.

Plaintiffs' evidence establishes that defendants intentionally segregated a substantial portion of the students, teachers, schools, and facilities, and in respect to public housing supported the discrimination of other bodies, both public and private, in all parts of the school district. The long list of findings set forth in Part III of this opinion amply demonstrates that defendants engaged in a pervasive and protracted pattern of intentional segregation in these areas and that these areas constitute a substantial and meaningful portion of the school district. On the basis of the proofs presented at trial, the Court has come to the conclusion "that there exists a predicate for a finding of the existence of a dual school system." 413 U.S. at 201, 93 S.Ct. at 2694.

The Court did not require plaintiffs to bear the burden of proving the elements of *de jure* segregation as to each and every school or each and every student within the school system. *Keyes, supra*, 413 U.S. at 200, 93 S.Ct. 2686. Nevertheless, plaintiffs did prove intentional faculty and staff segregation affecting every school in the district. The numbered findings in Part III of this opinion directly involve at least 60% of the schools in the district, in every geographic area, and these are only examples of the specific acts of defendants found to be segregative in purpose and intent by this Court. Plaintiffs' evidence also proved the segregative impact of these specific violations on the entire district. For example, the record shows that because of feeder patterns from elementary to junior high to senior high schools, each segregative action in an elementary school directly affected the racial makeup of at least two other schools. Moreover, the Court recognizes that the effect of creating and maintaining certain schools as "black" is to keep other schools "white". *See Swann, supra*, 402 U.S. at 20–22, 91 S.Ct. 1284. The record in this case amply supports this Court's finding that a segregative impact on the entire district resulted from the defendant's purposeful actions in the substantial portion of the district represented in plaintiffs' evidence.

II.

During the liability trial, both the local and state defendants attempted to explain or refute the proofs offered by the plaintiffs. The effort of the local defendants followed essentially three avenues: first, they argued that there had been no intent to violate the rights of minority children,

even though they admitted at the opening of trial that the schools were racially segregated; second, they offered what they considered to be neutral, educationally sound reasons for the numerous acts of racial segregation; third, they attempted to show that, regardless of their intent, their actions had not been a causal factor in the creation of the pervasive racial segregation they freely admitted existed. This Court has carefully considered the evidence offered by the local defendants.

With respect to the defense of good faith motives, there exists a long line of precedent in the federal courts declining to peer into the heads of public officials whose actions are public record. Following this precedent, the Court attempted to discover what was done, what alternatives existed, what evidence was offered to show that apparent nonsegregative or nondiscriminatory alternatives were unfeasible, and what results flowed from the policies chosen and the practices pursued.

■ To rebut the evidence of segregative purpose or intent, the defendants presented testimony by the present Superintendent and members of the school board that at all times they had acted in good faith and in the honest belief that their behavior would not injure the rights of minority pupils. It is possible, however, for a well-motivated act to be done for an unconstitutional purpose. A school district's decision to assign all black students to separate schools and assign black teachers to these schools on the theory that blacks relate better to blacks could be well motivated, but would clearly be purposefully segregative. If no mitigating factors were present, such behavior would be unconstitutional. Moreover, few of defendants' intentionally segregative acts were so well motivated. Therefore, defendants' evidence bearing on motivation, while carefully considered by the Court, was not persuasive on the question of purpose.

Second, the local defendants offered evidence to show that various actions complained of by the plaintiffs were supported by valid, racially neutral, educationally sound reasons. For instance, the defendants argued that they created optional attendance zones to permit students to avoid heavy traffic or other such safety hazards, or to address the problems of overcrowding. Various school construction decisions were defended as being responsive to sincere desires of local residents for neighborhood facilities. The assignment of black teachers and administrators to schools with majority black student enrollments was defended on the ground that such faculty or staff would be better able to relate to students of the same race. Where there was factual support for the claim that such decisions had compelling educational bases, or where legitimate safety concerns were being met in a plausible and nonracial manner, the allegations of the plaintiffs were set aside. However, there remain more than 200 enumerated actions cited in the liability opinion for which the explanations of the defendants either were not credible or were not legally permissible. In these instances, the Court finds that the defendants acted (1) *not only* with awareness of the natural, probable, and foreseeable consequences of their acts, (2) *but also* with the purpose and intent to maintain racial segregation.

■ An example is an optional attendance zone whose asserted basis was either to relieve overcrowding or to address a safety hazard such as heavy traffic or railroad crossings. If the problem to be addressed was overcrowding, student reassignment was called for, not student options. The option to choose not to attend an overcrowded school also logically implies the option to attend that overcrowded school. If some educational principles dictated a reduction in the teacher/pupil load, responsible educators should not logically allow students' own choices to frustrate the result. Similarly, logical decisionmaking would not give students the option to avoid a hazardous railroad crossing or highway, since implicit is also the option to face the hazard. School officials applying neutral educational principles would reasonably seek to minimize the opportunity for their charges to choose hazardous routes by reas-

signing or transporting such students. Therefore, since defendants' purportedly neutral reasons were incompatible with the evidence, the Court rejected them.

■ Another ostensibly neutral principle relied upon by defendants to explain their actions was the "neighborhood school" policy. See 422 F.Supp. at 790–92. However, this policy loses its neutrality when it is intentionally used as a tool to maintain residential, and thus school, segregation. Where the policy was so applied, therefore, the Court refused to consider it a valid excuse for the defendants' deliberate decisions to site school facilities and draw school attendance boundaries coincidental with residential segregation they knew to exist.

■ School officials are charged with knowing that Plessy v. Ferguson, with its separate but equal doctrine, was overruled in 1954 by the United States Supreme Court. School officials are charged with knowing that, as a matter of constitutional law, no amount of gilding of schools made racially separate by the intentional actions of public officials can make these racially separate schools educationally equal in the eyes of the law. Brown v. Board of Education, 347 U.S. 483, 75 S.Ct. 753, 99 L.Ed. 1083 (1954). Thus, the deliberate decision to relegate black faculty and staff to schools the school officials knew had been earlier made black by their other actions was a decision to foster and maintain a constitutionally impermissible dual school system.

■ The third major line of defense by the local defendants was that their actions had not been a proximate cause of the existing pervasive racial segregation. In the language of Keyes, defendants' burden was to show that its policies and practices "either were not taken in effectuation of a policy to create or maintain segregation . . . or, if unsuccessful in that effort, were not factors in causing the existing condition of segregation in these schools." Keyes, supra, 413 U.S. at 213–14, 93 S.Ct. at 2700. Defendants failed to carry this bur-

den. Their failure in this regard requires the Court to conclude that their intentional segregative behavior has been a substantial factor causing the existing segregation in the Cleveland schools.

■ The evidence shows that these defendants deliberately built new schools in a racially segregative manner, that they built additions to existing schools in a racially segregative manner, that they placed portable units in a racially segregative manner, that they rented private facilities for public use in a racially segregative manner, that they created optional attendance zones and relay classes and bused students intact in a racially segregative manner, that they assigned faculty and staff in a racially segregative manner, that they operated student transfer programs in a racially segregative manner, that they designed attendance boundaries and school feeder patterns in a racially segregative manner, that they either built schools in racially segregated public housing estates or built schools to serve racially segregated public housing estates, and that they manipulated school facility space in a racially segregative manner. Against such a backdrop of deliberate and successful racially segregative activity, extending over a forty-year period, these defendants argued that their actions were somehow contained and had no impact upon the racial character of Cleveland's residential communities. The evidence is entirely to the contrary; it disclosed that the defendants' actions were causal factors in the residential segregation, and that these defendants deliberately chose to incorporate known residential segregation in their own independent school planning decisions.

Quite apart from the lack of defendants' evidence to rebut the presumption they had caused the present dual school system, there is independent evidence to support such a determination. Numerous examples demonstrate that the school district was committed to racial containment and was signaling to anyone with eyes to see that Cleveland would preserve its dual school system.

As the Supreme Court has recognized: People gravitate toward school facilities . . . The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods.

In the past, choices [as to construction and closing of schools] have been used as a potent weapon for creating or maintaining a state-segregated school system . . . Such a policy does more than simply influence the short-run composition of the student body of a new school. It may promote segregated residential patterns which, when combined with "neighborhood zoning," further lock the school system into the mold of separation of the races.

*Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 20–21, 91 S.Ct. 1267, 1278, 28 L.Ed.2d 586 (1971).

For decades, the defendants and their predecessors signaled to blacks where "their" schools were located—the central and east side of Cleveland. They signaled to whites which schools were "theirs"— those on the west side of Cleveland. By racially identifying schools, defendants became one of the substantial causes of segregated residential areas in Cleveland. It follows then that by fostering segregation in residential areas, defendants became substantially responsible for the segregated character of the schools serving these residential areas.

The Court also reviewed the evidence offered by the State defendants. These defendants sought to persuade the Court that whatever constitutional violations might be found to exist in Cleveland's public schools were solely the result of the local defendants' actions. The State defendants disclaimed any ability to site schools, assign students, hire teachers, hire or assign administrative staff, design optional attendance zones, operate student transfer policies, etc. Such decisions, they urged, were the sole province of the local school officials. Additionally, the State defendants sought to demonstrate to the Court that numerous pamphlets, bulletins, and other communications urged local school officials, generally, to comply with all pertinent state and federal laws.

At the same time, these defendants did not credibly explain why they ignored a 1956 opinion by the State Attorney General, their lawyer, that they had an obligation to seek information as to whether racial segregation in public schools existed and, finding such segregation, had a further obligation to take all necessary actions to eliminate racial segregation, including the withholding of state funds. The State defendants admitted that they had the power to establish minimum standards for all local school districts and that they refused or failed to establish any minimum standards concerning racial segregation of pupils, faculty, staff, or use of facilities. The State defendants did not credibly explain why they had never taken a single action to withhold state funds from the Cleveland school district for failure to reduce or eliminate racial segregation of pupils or staff. Nor did the State defendants credibly explain why they agreed to permit the local school district to warehouse black students in overcrowded school buildings by granting a waiver of the state minimum standard calling for at least five hours of schooling per day during the school year. The State defendants did not initiate administrative sanctions of any kind, did not initiate legal action of any kind, did not recommend to the Governor or Attorney General that they initiate legal action of any kind to compel the local defendants to cease operating a racially segregated public school system. The State defendants did convince the Court that, at least since 1956, they had substantial knowledge of the obligation to take corrective action by way of the Attorney General's opinion. The State defendants also convinced the Court that, at least from 1967 forward, they had precise and detailed knowledge of the racial segregation which existed in Cleveland by way of the annual racial surveys the State Department of Education required local school districts to conduct and forward to Columbus.

Because of their consistent record of default in their official duties, the State defendants became a part of the problem,

not part of the solution. The Ohio State Constitution recognizes that education is a state function. Section 3301.07 *et seq.* of the Ohio Revised Code gives the State Board of Education and Superintendent the principal duty of supervising and coordinating the state mandates and obligations in this area. While not losing sight of the allocation of roles between local and state education officials, the Court rejects the defense of the State defendants that they were without either duty or power to address and correct the illegalities they knew to exist.

### III.

In order to illustrate the pervasiveness of the violations found to have been committed by the defendants, and in keeping with the suggestion of the Court of Appeals in its July 20, 1977 opinion, the Court has categorized the original findings according to the techniques employed, indicating the schools involved, the year the cited incident occurred, the page of the recorded opinion (422 F.Supp.) on which the incident is noted, and the record evidence partially relied upon by the Court in its determinations. It should be emphasized that the instances set forth below and in the Court's finding of liability are merely illustrative of the evidence considered by the Court in arriving at its determinations. These instances do not represent an exhaustive list of the massive amount of evidence of constitutional violations presented and considered by this Court prior to arriving at a final decision.

| | SCHOOLS INVOLVED | YEAR | 422 F.Supp. | RECORD EVIDENCE CONSIDERED BY THE COURT |
|---|---|---|---|---|
| 1. | Hayes-Burroughs | 1941 | 719 | PX 274–A–16; 2; 74; 388–10; 388–33 |
| 2. | Hayes-Case-Woodland | 1941 | 719 | PX 274–A–16; 2; 74; 388–14; 388–33 |
| 3. | Hayes-Sterling | 1943 | 719–20 | PX 274–A–15; 4; 74; 388–33; 388–77 |
| 4. | Hayes-Sterling | 1948 | 721 | PX 274–A–4; 10; 74; 388–33; 388–77 |
| 5. | Marion-Mayflower | 1947 | 722 | PX 274–A–2; 9; 74; 388–51; 388–54 |
| 6. | Longwood-Mayflower | 1951 | 724 | PX 274–B–9; 13; 74; 388–49; 388–54 |
| 7. | Tod-Chesnutt | 1954 | 727–28 | PX 16; 74; 388–15; 388–79 |
| 8. | Woodland-Wayne | 1964 | 730 | PX 292–6; 74; 388–82; 388–84 |
| 9. | Woodland-Rice | 1964 | 730 | PX 292–6; 74; 388–70; 388–84 |
| 10. | Cleaveland-Gracement | 1947 | 736 | PX 287–4; 388–4; 388–18 |
| 11. | Beehive-Gracement | 1947 | 736 | PX 9; 388–4; 388–29 |
| 12. | Fulton-Rickoff | 1960 | 747 | PX 290–3; 22; 74; 388–26; 388–71 |
| 13. | Rickoff-Cleaveland | 1960 | 747 | PX 22; 74; 388–18; 388–71 |
| 14. | Revere-Mt. Pleasant | 1964 | 747 | PX 290–15; 271; 74; 388–66; 388–69 |
| 15. | Rickoff-Fulton | 1964 | 748 | PX 290–17; 271; 74; 388–26; 388–71 |
| 16. | Gracement-Rickoff | 1964 | 748 | PX 271; 74; 388–29; 388–71 |
| 17. | Cleaveland-Rickoff | 1964 | 748 | PX 271; 74; 388–18; 388–71 |
| 18. | Gracement-Cleaveland | 1964 | 748 | PX 287–31; 271; 74; 388–18; 388–29 |
| 19. | Revere-Corlett | 1967 | 748 | PX 25; 74; 388–20; 388–69 |
| 20. | Woodland Hills-Union | 1969 | 749 | PX 291–13; 27; 74; 388–85 |
| 21. | Mt. Auburn-Rice | 1971 | 749 | PX 29; 74; 223; 388–70 |
| 22. | Mt. Auburn-Boulevard | 1971 | 749 | PX 29; 74; 223; 388–8 |
| 23. | Boulevard-Mt. Pleasant | 1971 | 749 | PX 29; 74; 223; 388–8; 388–66 |
| 24. | Revere-Mt. Pleasant | 1971 | 749 | PX 290–16; 29; 74; 223; 388–8; 388–69 |
| 25. | Boulevard-Woodland Hills | 1971 | 749 | PX 291–14; 35; 74; 223; 388–8; 388–85 |
| 26. | Revere-Corlett | 1972 | 749 | PX 291–11; 36; 223; 388–20; 388–69 |
| 27. | Hough-Dunham | 1954 | 752–53 | PX 289–26; 16; 74; 388–25; 388–38 |
| 28. | Hough-Wade Park | 1954 | 752 | PX 289–39; 16; 74; 388–38; 388–80 |
| 29. | Hough-Wade Park | 1953 | 753 | PX 15; 74; 388–38; 388–80 |
| 30. | Hough-Wade Park | 1954 | 753 | PX 289–57; 16; 74; 388–38; 388–80 |
| 31. | Hough-Orr | 1955 | 753 | PX 289–40; 17; 74; 388–38; 388–63 |

### A. BOUNDARY CHANGES

■ In 53 instances involving a total of 43 schools, the Court found that the defendants made changes in boundaries in a manner which, predictably, resulted in racial segregation. The information available to the defendants at the time they acted was such that the segregation created was de-

termined by the Court to be deliberate and also avoidable. In some instances the boundary changes created segregation where none previously existed. In other instances, the changes intensified a racial identifiability which was known, or should have been known, to exist by the defend- ants. In the face of the evidence submitted, and the failure of the defendants to offer credible racially neutral explanations for the resulting segregation, the Court found each of the following boundary changes to have been acts of *de jure* segregation.

| | SCHOOLS INVOLVED | YEAR | 422 F.Supp. | RECORD EVIDENCE CONSIDERED BY THE COURT |
|---|---|---|---|---|
| 32. | Dunham-Rockefeller | 1961 | 756 | PX 23; 74; 388–6; 388–72 |
| 33. | Wade Park-Rockefeller | 1961 | 756 | PX 289–62; 74; 23; 388–72; 388–80 |
| 34. | Hodge-E. Madison | 1961 | 756 | PX 23; 74; 388–36; 388–50 |
| 35. | Morgan-Sowinski | 1961 | 756 | PX 23; 74; 388–59; 388–75 |
| 36. | Morgan-Raper | 1962 | 757 | PX 24; 74; 388–59; 388–68 |
| 37. | Morgan-Sowinski | 1962 | 757 | PX 24; 74; 388–59; 388–75 |
| 38. | Dunham-Ireland | 1962 | 757 | PX 289–34; 24; 74; 3–8–25; 388–41 |
| 39. | Rockefeller-Dunham | 1962 | 757 | PX 289–35; 24; 74; 388–25; 388–72 |
| 40. | Wade Park-Dunham | 1962 | 757 | PX 289–35; 24; 74; 388–25; 388–80 |
| 41. | Wade Park-Raper | 1962 | 757 | PX 289–65; 24; 74; 388–68; 388–80 |
| 42. | Attucks-Raper | 1962 | 751 | PX 24; 74; 388–2; 388–68 |
| 43. | Wade Park-Dunham | 1962 | 757 | PX 289–35; 24; 74; 388–25; 388–80 |
| 44. | Attucks-Dunham | 1962 | 757 | PX 289–35; 24; 74; 388–2; 388–25 |
| 45. | Sowinski-Morgan | 1970 | 759 | PX 28; 74; 388–59; 388–75 |
| 46. | Dunham-Attucks | 1972 | 760 | PX 289–36; 29; 223; 388–4; 388–25 |
| 47. | Holmes-Lake | 1961 | 773–74 | PX 22; 74; 388–37; 388–45 |
| 48. | Standish-Lake | 1961 | 773–74 | PX 22; 74; 388–37; 388–58 |
| 49. | Parkwood-Columbia | 1961 | 773–74 | PX 22; 74; 388–19; 388–64 |
| 50. | Columbia-Standish | 1961 | 773–74 | PX 22; 74; 388–19; 388–58 |
| 51. | Pasteur-Holmes | 1961 | 773–74 | PX 23; 388–65; 388–37 |
| 52. | Sowinski-Morgan | 1970 | 776 | PX 28; 388–59; 388–75 |
| 53. | E. Clark-Longfellow | 1963 | 777–78 | PX 294–1; 74; 388–17; 388–47 |
| 54. | E. Clark-Longfellow | 1969 | 778 | PX 294–3; 74; 388–17; 388–47 |

## B. CONVERSION OF BOARD-OWNED FACILITIES

The Court found that in three instances, the defendants converted board-owned facilities to other uses, and in so doing, purposefully and effectively segregated students.

| | | | | |
|---|---|---|---|---|
| 55. | Outhwaite | 1944 | 720–721 | PX 274–A–3; 6; 74; 138; 388–5 |
| 56. | Longwood | 1950 | 723–24 | PX 274–B–4;<br>PX 274–B–5; 12; 16; 74; 128; 132; 388–49 |
| 57. | Longwood | 1954 | 724 | PX 274–B–4;<br>PX 274–B–274–B–5; 12; 16; 74; 128; 132; 388–49 |

## C. OPTIONAL ZONES

The record contains extensive documentation and testimony on the use by the defendants of optional attendance zones, by means of which students were permitted to choose to attend one of two or more schools. While the defendants sought to justify these optional zones by reference to safety and other considerations, the Court did not find their explanations credible. The Court also found that the defendants knew in each instance cited that the predictable result of giving white or black students the option of attending predominantly white or black schools would be student choices which would create or intensify racial segregation. Thus, school officials set in motion a chain of events by means of which the foreseeable decisions of minor children and their parents would create a predictable segregative pattern. Public school officials may not commit acts of racial discrimination and segregation because of community pressure for such results. Public school officials may not support or encourage private discrimination. The

Cleveland defendants defaulted in meeting their constitutional obligation by the use of a pattern of predictably segregative optional zones.

### OPTIONAL ZONES

| | SCHOOLS INVOLVED | YEAR | 422 F.Supp. | RECORD EVIDENCE CONSIDERED BY THE COURT |
|---|---|---|---|---|
| 58. | Hayes-Case-Woodland | 1944 | 721 | PX 274–A–14; 6; 74; 388–14; 388–33 |
| 59. | Irving-Woodland | 1941–52 | 730 | PX 288–1; 288–5; 2; 14; 74; 388–42; 388–84 |
| 60. | Miles-Cleaveland | 1938–63 | 733–34 | PX 287–20; 1–24; 74; 388–18; 388–56 |
| 61. | Beehive-Cleaveland | 1945 | 736 | PX 287–3; 7; 388–4; 388–18 |
| 62. | Beehive-Cleaveland-Gracemont | 1947 | 736 | PX 287–5; 9; 388–4; 388–18; 388–29 |
| 63. | Cleaveland-Corlett | 1949 | 737 | PX 287–17; 11; 388–18; 388–20 |
| 64. | Beehive-Gracement | 1952 | 737–38 | PX 14; 74; 388–4; 388–29 |
| 65. | Beehive-Williams | 1957 | 739 | PX 19; 74; 388–4; 388–83 |
| 66. | Lafayette-Rice | 1940–64 | 743 | PX 290–7; 388–44; 388–70 |
| 67. | Rickoff-Fulton | 1938 | 743–44 | PX 290–1; 388–26; 388–71 |
| 68. | Cleaveland-Corlett | 1940 | 744 | PX 287–19; 1; 388–18; 388–20 |
| 69. | Rickoff-Dickens | 1940 | 744 | PX 290–19; 1; 388–22; 388–71 |
| 70. | Rickoff-Corlett | 1940 | 744 | PX 290–20; 1; 388–20; 388–71 |
| 71. | Lafayette-Rice | 1944 | 745 | PX 290–8; 6; 388–44; 388–70 |
| 72. | Lafayette-Rice | 1941 | 745 | PX 1; 388–44; 388–70 |
| 73. | Fulton-Rickoff | 1951 | 746 | PX 290–2; 13; 74; 388–26; 388–71 |
| 74. | Lafayette-Mt. Pleasant | 1954 | 746–47 | PX 290–10; 15; 74; 388–44; 388–66 |
| 75. | Irving-Woodland | 1967 | 748–49 | PX 275–9; 275–20; 25; 74; 388–42; 388–84 |
| 76. | Mt. Auburn-Woodland | 1967 | 748–49 | PX 25; 74; 388–84 |
| 77. | Observation-Murray Hill | 1939 | 751 | PX 286–1; 1; 388–61; 388–62 TR 2467–68 |
| 78. | Observation-Murray Hill | 1952 | 751 | PX 286–1; 1; 13; 14; 388–61; 388–62 TR 2467–68 |
| 79. | Hough-Wade Park | 1940 | 751 | PX 275–7; 1; 388–38; 388–80 |
| 80. | Quincy-Bolton | 1942 | 751 | PX 275–1; 3; 388–7; 388–67 |
| 81. | Sowinski-Hodge | 1942 | 751 | PX 3; 388–36; 388–75 |
| 82. | Doan-Wade Park | 1943 | 752 | PX 275–4; 4; 388–24; 388–80 |
| 83. | Hough-Doan | 1944 | 752 | PX 5; 388–24; 388–38 |
| 84. | Orr-Doan | 1955 | 752 | PX 17; 74; 388–24; 388–63 |
| 85. | Rosedale-Murray Hill | 1950–67 | 765 | PX 1; 388–61; 388–74 |
| 86. | Observation-Rosedale | 1943 | 765 | PX 286–3; 4; 388–62; 388–74 |
| 87. | Observation-Murray Hill | 1956 | 765 | PX 18; 74; 388–61; 388–62 |
| 88. | Observation-Doan | 1945 | 765–66 | PX 286–12; 7; 388–24; 388–62 |
| 89. | Columbia-Holmes | 1947 | 766 | PX 293–31; 293–35; 9; 74; 388–19; 388–37 |
| 90. | Holmes-Chesterfield | 1948–58 | 766 | PX 10–20; 74; 388–16; 388–37 |
| 91. | Longfellow-Memorial | 1947 | 777 | PX 294–6; 9; 74; 388–47; 388–55 |
| 92. | Longmead-Hawthorne | 1930 | 779–80 | PX 297–7; 388–32; 388–48 |
| 93. | Brooklawn-Longmead | 1967 | 780 | PX 25; 388–48 |
| 94. | Hawthorne-Agassiz-Longmead-Brooklawn | 1957 | 781–82 | PX 298–5; 19; 74; 388–1; 388–32; 388–48 |

## D. ASSIGNMENT OR REASSIGNMENT OF STUDENTS

The Court received testimony and documentary evidence that the defendants, on many occasions, were faced with the need to close a school or to reassign students because of overcrowding and other factors. In a significant number of instances, faced with the opportunity to make either integrative or segregative assignments or reassignments, these defendants chose the predictably segregative option. In these cases, there was no question that school officials decided which schools were attended by which students. Where, as here, school officials purposely decided to assign students to certain schools when these officials knew that such attendance would create or intensify racial segregation, this Court found *de jure* segregation. Illustrative of such segregative assignment decisions are the following:

ASSIGNMENT OR REASSIGNMENT OF STUDENTS

| | SCHOOLS INVOLVED | YEAR | 422 F.Supp. | RECORD EVIDENCE CONSIDERED BY THE COURT |
|---|---|---|---|---|
| 95. | Kinsman-Rawlings | 1944 | 726 | PX 275–42; 6–20; 74; 123–138; 388–43 |
| 96. | Kinsman-Grdina | 1967 | 728 | PX 275–39; 25; 74; 388–15; 388–30; 388–43 |
| 97. | Kinsman-Chesnutt | 1967 | 728 | PX 275–39; 25; 74; 388–15; 388–30; 388–43 |
| 98. | Carver-Central Jr. | 1957–60 | 732 | PX 276–4; 19–22; 74; 388–11 |
| 99. | Burroughs-Dike | 1967 | 732 | PX 275–23; 25; 74; 388–10; 388–23 |
| 100. | Giddings-Burroughs | 1967 | 732 | PX 285–2; 25; 74; 388–10; 388–27 |
| 101. | Hayes-Longwood | 1968 | 733 | PX 274–C–7; 26; 27; 74; 388–11; 388–33; 388–49 |
| 102. | Hayes-Carver | 1969 | 733 | PX 274–C–7; 26; 27; 74; 388–11; 388–33; 388–49 |
| 103. | Hayes-Jane Addams | 1968 | 733 | PX 274–C–7; 26; 74; 388–33 |
| 104. | Gracemont-Cleaveland | 1940 | 734 | PX 1; 142; 388–18; 388–29 |
| 105. | Hough-Addison Jr. | 1952 | 753 | PX 289–41; 14; 74; 388–38 |
| 106. | Wade Park-Addison Jr. | 1957 | 753 | PX 289–61; 19; 74; 388–80 |
| 107. | Dunham-Addison Jr. | 1957 | 754–55 | PX 289–3; 19; 74; 388–25 |
| 108. | Wade Park-Addison Jr. | 1957 | 754–55 | PX 289–61; 19; 74; 388–80 |
| 109. | Dunham-Addison Jr. | 1947 | 755 | PX 11; 74; 388–25 |
| 110. | Parkwood-Patrick Henry Jr. | 1953 | 767–68 | PX 293–20; 15; 74; 388–64 |
| 111. | Columbia-Patrick Henry Jr. | 1954 | 770 | PX 293–4; 16; 74; 388–19 |
| 112. | Columbia-Empire Jr. | 1954 | 770 | PX 293–4; 16; 74; 388–19 |
| 113. | Parkwood-Patrick Henry Jr. | 1956 | 770 | PX 293–20; 18; 74; 388–64 |
| 114. | Standish-Empire Jr. | 1956 | 770 | PX 293–29; 18; 74; 388–58 |
| 115. | Holmes-Glenville Sr. | 1959 | 774 | PX 293–13; 21; 74; 388–37 |

## E. CONSTRUCTION OF NEW SCHOOL FACILITIES

The placement of school facilities on particular sites is an action with a singular capacity to promote either integration or segregation. Few decisions made by school officials are more irreversible. While school officials are not required to predict correctly shifting demographic patterns in every instance, they are required to use reasonable prudence to avoid predictably segregative decisions. The Court recognizes that the task is more difficult in communities undergoing rapid change than in settled neighborhoods. However, the evidence demonstrated conclusively that these defendants made segregative building placement decisions regardless of whether the surrounding community was settled or changing. Few schools were sited so as to avoid the predictable result of racial segregation. The Court found that in each of the instances cited below the defendants built schools which they knew would be racially segregated, and intended such results. Segregative site selection combined as here with segregative student assignment policies and practices contributed to creation of a segregated dual school system.

CONSTRUCTION

| | SCHOOLS INVOLVED | YEAR | 422 F.Supp. | RECORD EVIDENCE CONSIDERED BY THE COURT |
|---|---|---|---|---|
| 116. | Carver | 1954 | 725 | PX 16; 74; 128; 33–11; 323 |
| 117. | Chesnutt | 1955 | 726–28 | PX 275–33; 17; 74; 388–15; 323 |
| 118. | Giddings | 1970 | 758–59 | PX 285–3; 28; 388–27; 389 |
| 119. | Dike | 1971 | 732 | PX 276–8; 29; 388–23; 389 |
| 120. | Williams | 1951 | 737–38 | PX 287–35; 14; 74; 388–83 |
| 121. | Brewer | 1955 | 738–39 | PX 287–21; 17; 74; 388–9; 389; 323 |
| 122. | Cranwood | 1958 | 738–39 | PX 291–2; 20; 74; 388–21; 389 |
| 123. | deSauze | 1967 | 741–43 | PX 287–22; 25; 74; 389 |
| 124. | Orr | 1955 | 752 | PX 289–41; 17; 74; 388–63; 389 |

| | SCHOOLS INVOLVED | YEAR | 422 F.Supp. | RECORD EVIDENCE CONSIDERED BY THE COURT |
|---|---|---|---|---|
| 125. | Attucks | 1959 | 756 | PX 21; 74; 388–2; 389 |
| 126. | Rockefeller | 1961 | 756 | PX 23; 74; 388–72; 389 |
| 127. | Ireland | 1962 | 757 | PX 275–28; 24; 74; 323; 388–41; 389 |
| 128. | Raper | 1961 | 757 | PX 289–51; 23; 74; 388–68; 389 |
| 129. | Buckeye-Woodland | 1971 | 759–60 | PX 29; 223; 389 |
| 130. | Wade Park | 1974 | 762 | PX 289–66; 390; 389 |
| 131. | Marion-Sterling | 1974 | 763 | PX 389–390–388–52; 323 |
| 132. | Case | 1974 | 763 | PX 289–24; 389; 390; 388–12; 388–13 |
| 133. | Morgan | 1959 | 770–71 | PX 293–69; 21; 74; 388–59; 389 |
| 134. | Pasteur | 1959 | 770–71 | PX 293–20; 21; 74; 388–65; 389 |
| 135. | Lake | 1961 | 770–71 | PX 293–66; 23; 74; 388–45; 389 |
| 136. | Landis | 1963 | 770, 772 | PX 293–68; 74; 388–46; 389 |
| 137. | Howe | 1965 | 770, 772 | PX 293–96; 389; 388–39 |
| 138. | Forest Hill Parkway | 1968 | 774–76 | PX 293–48; 26; 389; 388–35 |
| 139. | Bethune | 1965 | 772 | PX 338–6; 389; 271 TR 976–981; 1283–87; 1504–05 |
| 140. | East Clark Relief | 1975 | 779 | PX 294–4; 390; 389 |
| 141. | Johnson | 1955 | 780–81 | PX 389; 17; 74 |
| 142. | Brooklawn | 1957 | 781–82 | PX 298–2; 389; 19; 74; TR 2464–2465 |

## F. ADDITIONS TO EXISTING SCHOOLS

Almost as irreversible as building a school in the wrong place is the practice of expanding such a school once it is in place. The defendants built hundreds of new classrooms, ostensibly to relieve overcrowding or to anticipate new enrollments. Each such decision offered these defendants the option of locating the addition so as to either promote or alleviate racial segregation. Obviously, the decision to build an addition onto a school which is 100% black is a decision to expand the number of black students contained on that particular site. Such containment decisions not only kept black schools black and white schools white but they also prevented black (or white) students from attending other schools. Thus, each segregative building of a new school or addition to an existing school has a predictable reciprocal impact. The Court finds that the defendants built such additions to further an overall scheme of racial segregation, to prevent or reduce the likelihood of black and white students attending school together. Illustrative of such deliberately segregative decisions are those cited by this Court and listed below.

ADDITIONS

| | SCHOOLS INVOLVED | YEAR | 422 F.Supp. | RECORD EVIDENCE CONSIDERED BY THE COURT |
|---|---|---|---|---|
| 143. | Quincy | 1940 | 731 | PX 284–1; 1; 74; 388–67 |
| 144. | Irving | 1961 | 731 | PX 275–29; 23; 74; 388–42 |
| 145. | Gracemont | 1949 | 736–37 | PX 287–27; 11 |
| 146. | Williams | 1953 | 738 | PX 287–36; 15; 74; 388–83 |
| 147. | Gracemont | 1958 | 740–41 | PX 287–30; 20; 74; 388–29; 389 |
| 148. | Mt. Pleasant | 1964 | 747 | PX 290–14; 271; 74; 388–69; 389 |
| 149. | Wade Park | 1954 | 753–55 | PX 289–56; 16; 74 |
| 150. | Waring | 1956 | 754 | PX 289–67; 18; 74; 389 |
| 151. | Orr | 1956 | 754 | PX 289–50; 18; 74; 389 |
| 152. | Parkwood | 1954 | 767–68 | PX 293–74; 16; 74; 388–64 |
| 153. | Holmes | 1955 | 769 | PX 293–56; 293–57; 17; 19; 74; 388–37; 38 |
| 154. | Holmes | 1957 | 769 | PX 293–56; 293–57; 17; 19; 74; 388–37; 38 |
| 155. | Doan | 1957 | 769 | PX 293–43; 19; 74; 388–24; 389 |
| 156. | Iowa-Maple | 1963 | 774 | PX 293–63; 74; 388–40; 389 |
| 157. | East Clark | 1960 | 775 | PX 294–2; 22; 74; 388–17 |
| 158. | Brooklawn | 1972 | 781 | PX 298–4; 30; 223; 389 TR 2464–65 |

## G. BUSING TO EFFECT RACIAL SEG-REGATION

The record discloses that the defendants were, on numerous occasions, called upon to transport students from one school to another. In some instances, busing was short-lived; in others, it extended over longer periods of time. In some instances busing was to relieve overcrowding, while in others it was responsive to a specific problem such as destruction of a building by fire. Frequently, the students bused were black and the receiving school was white. The record disclosed that the defendants often converted such integrative opportunities to racially segregative nightmares for the children involved. These defendants, on numerous occasions, deliberately chose to separate black children bused into a white school from the white children already there, keeping them in intact racial enclaves which included classrooms, recreation, use of toilet facilities, eating, arrivals, and departures. Few instances of overt segregation were found on this record to match these instances of "intact busing" for their dehumanizing impact upon small children. In those instances where school officials did make a decision to "disperse" these children within the receiving schools, often "dispersion" became an additional act of segregation. In some instances the black children "dispersed" to white classrooms were forced to sit apart, eat apart, recreate apart, and use toilet facilities at separate times. The record disclosed that in some instances these "dispersed" children were even publicly ridiculed for their academic work. Among the instances in which the defendants used busing to extend segregation were the following:

BUSING

| | SCHOOLS INVOLVED | YEAR | 422 F.Supp. | RECORD EVIDENCE CONSIDERED BY THE COURT |
|---|---|---|---|---|
| 159. | Kinsman-Dike | 1940 | 728 | PX 275–25; 25; 74; 388–23; 388–43 |
| 160. | Columbia | 1962 | 773 | PX 24; 74; 293–6 |
| 161. | Chesterfield-Murray Hill | 1961 | 782–84 | PX 39; 74; 126; 224; 261; 263; 331 to 342 TR 462–68a; 524; 1275–76; 1355–65; 1500–1502; 1512; 2425–26; 2489–91; 3216–17 |
| 162. | Columbia-Murray Hill | 1961 | 782–84 | Same as for #161 |
| 163. | Doan-Murray Hill | 1961 | 782–84 | Same as above |
| 164. | Hough-Murray Hill | 1961 | 782–84 | Same as above |
| 165. | Orr-Murray Hill | 1961 | 782–84 | Same as above |
| 166. | Marion-Rockefeller | 1961 | 782–84 | Same as above |
| 167. | Iowa-Maple-Longfellow | 1961–66 | 782–84 | Same as above |
| 168. | Holmes-Longfellow | 1961–62 | 782–84 | Same as above |
| 169. | Hazeldell-Brett | 1961–63 | 782–84 | Same as above |
| 170. | Hazeldell-Memorial | 1962–66 | 782–84 | Same as above |
| 171. | Hazeldell-Murray Hill | 1963–66 | 782–84 | Same as above |
| 172. | Pasteur-Longfellow | 1963 | 782–84 | Same as above |
| 173. | Iowa-Maple-Brett | 1964–66 | 782–84 | Same as above |
| 174. | Rockefeller-Marion | 1961 | 756 | PX 289–16; 23; 74 |
| 175. | Orr | 1962 | 757 | PX 289–14; 24; 74 |

## H. SCHOOL CLOSINGS

The Court found, on the basis of the record evidence and testimony, that the defendants used school closings as yet another opportunity to further a program of racial segregation. The closing of a school can be a racially neutral act. However, where the closing of a school was accompanied by the assignment of students therefrom to other schools in a racially segregative manner, this Court found de jure segregation. Examples of such illegal conduct are noted below.

| 176. | Harmon | 1949 | 731 | PX 276–13; 11; 74; 388–31 |
|------|--------|------|-----|---------------------------|
| 177. | Mayflower | 1961 | 731 | PX 276–23; 23; 74; 388–54 |
| 178. | Gladstone | 1964 | 731 | PX 276–12; 74; 388–28 |
| 179. | Case Woodland | 1966 | 732 | PX 276–7; 74; 388–14 |
| 180. | Dunham | 1975 | 760 | PX 289–37; 390; 278; 281 |
| 181. | Hough | 1974 | 761 | PX 289–46; 390; 279; 281 |
| 182. | Waring | 1975 | 763 | PX 289–68; 390; 388–81 |

## I. PORTABLE CLASSROOM FACILITIES

The record disclosed that in the face of opportunities to site portable classrooms so as to avoid racial segregation, the defendants consistently chose to place them so as to either create or intensify existing racial segregation. Since portable units are not, historically, moved from site to site, for all intents and purposes the placement of portable units was undistinguishable in impact from the building of additions.

### PORTABLES

| | SCHOOLS INVOLVED | YEAR | 422 F.Supp. | RECORD EVIDENCE CONSIDERED BY THE COURT |
|------|------------------|------|-------------|------------------------------------------|
| 183. | Quincy | 1956 | 731 | PX 284–4; 18; 74; 388–67 |
| 184. | Gracemont | 1943 | 735 | PX 287–24; 4; 74; 388–29; 139 |
| 185. | Wade Park | 1953 | 753–54 | PX 289–55; 15; 74 |
| 186. | Wade Park | 1956 | 753–54 | PX 289–59; 18; 74 |
| 187. | Dunham | 1956 | 754–55 | PX 289–4; 18; 74 |
| 188. | Rosedale | 1954 | 768 | PX 293–26; 16; 18; 19; 74; 388–74 |
| 189. | Rosedale | 1956 | 768 | PX 293–26; 16; 18; 19; 74; 388–74 |
| 190. | Rosedale | 1957 | 768 | PX 293–26; 16; 18; 19; 74; 388–74 |
| 191. | Chesterfield | 1956 | 769 | PX 293–1; 18; 74; 388–16 TR 2479–80 |
| 192. | Parkwood | 1956 | 770 | PX 293–21; 18; 74 |
| 193. | Standish | 1956 | 770 | PX 293–28; 18; 74 |

## J. TRANSFER AND ANNEXATION OF SCHOOL TERRITORY BETWEEN SCHOOL DISTRICTS

Local school districts may, with state approval, annex or de-annex school territory. Such interdistrict transfers of school territory, like the intradistrict change of school boundaries, may contribute to racial segregation. The Court found that, in two instances, the local and state defendants effected the transfer of school territory from the Cleveland Public Schools to surrounding districts in a manner which was intentionally and predictably racially segregative.

| 194. | Beehive | 1944 | 735 | PX 287–1; 6; 7; 388–4 |
|------|---------|------|-----|------------------------|
| 195. | Rosedale | 1956 | 769 | PX 18; 74; 388–74 |

## K. CHANGING GRADE STRUCTURES TO EFFECT RACIAL SEGREGATION

The Court found that in four instances the defendants changed the internal grade structure of individual schools in a manner which deliberately and predictably created racial segregation. These findings and conclusions were based not solely on the act of changing the particular grades, but also on a consideration of the nonsegregative alternatives known to defendants. One of the impacted schools was on the west side, the other on the east side, but both had existing racial segregation intensified by the actions of these defendants.

| SCHOOLS INVOLVED | YEAR | 422 F.Supp. | RECORD EVIDENCE CONSIDERED BY THE COURT |
|---|---|---|---|
| 196. Williams | 1954 | 737 | PX 287–36; 16; 74; 388–83 |
| 197. Brooklawn | 1972 | 782 | PX 298–3; 31; 223 |
| 198. Brooklawn | 1973 | 782 | PX 298–3; 31; 223 |
| 199. Brooklawn | 1974 | 782 | PX 298–3; 31; 223 |

## L. USE OF PRIVATE RENTAL FACILITIES TO EFFECT RACIAL SEGREGATION

The Court found that, on several occasions, the defendants resorted to the rental of private facilities, ostensibly to relieve overcrowding. In the instances cited below, the use of rental facilities had the predictable and intended result of creating or intensifying racial segregation, a result which could have been avoided had the defendants chosen to use available public school facilities attended by members of the opposite race. The decision to rent private facilities under these circumstances not only resulted in the intended racial segregation, but also represented wasteful use of public funds, funds school officials now say are in short supply.

| SCHOOLS INVOLVED | YEAR | 422 F.Supp. | RECORD EVIDENCE CONSIDERED BY THE COURT |
|---|---|---|---|
| 200. Wade Park | 1956 | | PX 127; 18; 74 |
| 201. Wade Park | 1957 | 754–55 | PX 126; 18; 74 |
| 202. Dunham | 1960 | 755 | PX 289–6; 22; 74 |
| 203. Morgan | 1961 | 756 | PX 289–12; 23; 74 |
| 204. Doan | 1956 | 769 | PX 293–8; 17; 74; 388–24 |
| 205. Doan | 1956 | 769 | PX 293–8; 18; 74; 388–24 |
| 206. Holmes | 1963–68 | 774 | PX 293–16; 25; 26; 74 |

## M. MANIPULATION OF SCHOOL CAPACITY TO EFFECT RACIAL SEGREGATION

The record disclosed that the defendants manipulated classroom capacities as a further means of effecting racial segregation. In some instances the defendants permitted "black" schools to be operated at overcapacity rather than transfer or reassign these black students to "white" schools they knew had available classroom space. On the seven occasions cited below the defendants operated black schools on double sessions, sometimes referred to as "relay classes." During these "relay classes," the students were given less than the state mandated minimum number of hours per day, and were also by this means contained in all or nearly all black schools, and away from underutilized white schools.

| | | | |
|---|---|---|---|
| 207. Dunham | 1955–61 | 754–55 | PX 289–2; 17; 18; 19; 20; 21; 22; 23; 74 |
| 208. Rockefeller | 1961 | 756 | PX 289–15; 23; 74; 388–72 |
| 209. Morgan | 1961 | 756 | PX 289–11; 23; 74 |
| 210. Orr | 1962 | 757 | PX 289–13; 24; 74 |
| 211. Doan | 1955 | 769 | PX 293–7; 17; 74; 388–24 |
| 212. Columbia | 1959–60 | 773 | PX 293–5; 21; 22; 74; 388–19 |

The record also disclosed that the defendants deliberately chose to keep some schools underutilized as a means of preventing black and white students from attending the same schools. Cranwood and Murray Hill are examples of this segregative practice.

| | | | |
|---|---|---|---|
| 213. Cranwood | 1944 generally | 736 | PX 291–1; 6 |
| 214. Murray Hill | | 763–64 | PX 385 |

Against the extensive evidence presented on the subject of facility manipulation to effect or maintain racial segregation, this Court found that the defendants were guilty of *de jure* segregation.

## N. SPECIAL TRANSFERS

■ The record in this case indicated that special transfers were used by the Cleveland School Board to allow white students to "escape" from predominantly black neighborhood schools. While the number of transfers was not large, the Court found that the transfers were a significant factor in the shift in enrollment patterns in junior and senior high schools during the period 1965–1970.

These transfers were individually granted by direct action of the local defendants. Under the circumstances, they must be considered as purposeful acts of segregation on the part of these defendants, and as a further indication that defendants were operating a dual school system.

Special transfers are discussed in 422 F.Supp. at 784–86. The Court's findings reflect the information contained in plaintiffs' exhibits 346, 355, 357, 358, 361, and 363; defendants' exhibit 1170; and testimony presented at trial, including that at TR 2120–21.

## O. FACULTY ASSIGNMENT

■ The court received extensive evidence and testimony on the policies and practices by which the defendants assigned teaching faculty. The Supreme Court affirmed the right and standing of students to litigate claims of faculty segregation, at least in part because it was recognized that teachers serve important functions as role models, and that both black and white teachers have important roles to play in this respect. *Rogers v. Paul*, 382 U.S. 198, 200, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965); *Lee v. Macon County Bd. of Educ.*, 453 F.2d 1104, 1109–10 (5th Cir. 1971); *Spangler v. Pasadena Bd.*, 311 F.Supp. 401, 516–17, 523 (C.D. Cal.1970).

In *Swann*, the Supreme Court cautioned that, "[i]ndependent of student assignment, where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff . . . a prima facie case of violation of substantive constitutional rights under the Equal Protection Clause is shown". 402 U.S. at 18, 91 S.Ct. at 1277.

*United States v. Texas Ed. Agency*, 564 F.2d 162, 173 (5th Cir. 1977). Furthermore, "faculty segregation is especially probative of a school board's intent to discriminate because of the high degree of control school boards exercise over such matters as faculty placement." *Id.* at n. 19, 173–74.

Attempts to justify teacher segregation on educational grounds by these defendants were rejected by this Court, as such attempts have uniformly been rejected in the federal courts. *Morgan v. Kerrigan*, 509 F.2d 580, 596–98 (1st Cir. 1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975); *Cato v. Parham*, 403 F.2d 12, 14–15 (8th Cir. 1968); *Smith v. Bd. of Educ.*, 365 F.2d 770, 781–82 (8th Cir. 1966); *Arthur v. Nyquist*, 415 F.Supp. 904, 945–46 (E.D.N.Y. 1976); *Oliver v. Kalamazoo Bd.*, 368 F.Supp. 143, 177 (W.D.Mich.1973), *aff'd* 508 F.2d 178 (6th Cir. 1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975); *U. S. v. School Dist. 151*, 432 F.2d 1147 (7th Cir. 1970). *See also Keyes v. School Dist. No. 1*, 445 F.2d 990, 1007 (10th Cir. 1971), *rev'd*, 413 U.S. 189, 199–200, 202, 206, 213–14, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).

The Court found massive teacher segregation to have been the rule in the Cleveland Public Schools for the recent past and continuing at the time of trial. During the period from 1969–1973, 84% of the black elementary and junior high school teachers and 90% of the black senior high school teachers taught in schools which were 90% black in student enrollment. The Court found that there was almost perfect correlation between the race of a school's student

enrollment and the race of its faculty. Thus, intentional segregative faculty assignment directly touched every school in the Cleveland system. The Court found that the teacher assignment practices and policies of the defendants constituted system-wide *de jure* segregation.

The Court's findings on faculty segregation were discussed in 422 F.Supp. at 786–88. The Court, in arriving at these findings, took into account the testimony presented during trial at transcript pages 11, 73, 1336, 1560–63, 1641, 1663–73, 1687, 1708–11, 1714. Additionally, the Court relied upon the following unrefuted plaintiffs' exhibits: 189, 193, 198, 224, 225, 297, 340, 343, 344.

## P. SCHOOL SEGREGATION IMPACTING AND BUILDING UPON HOUSING SEGREGATION

The Court reviewed extensive evidence and testimony on the relationship between Cleveland's residential segregation and its educational segregation. Based upon the evidence which was unrefuted on the record, this Court found that the Cleveland schools had been and were a causal factor in the residential segregation which is rampant in the city. School officials were knowledgeable of residential segregation and exploited it for their own purposes by building schools to service racially segregated public housing estates, building schools to service and help contain racially segregated private housing, and by actually using some segregated public housing facilities as classrooms to contain black students and white students in a racially segregative manner. The Supreme Court has noted the powerful impact which school and housing choices may have upon each other, sometimes one being the segregative force, sometimes the other. *See Keyes v. School District No. 1,* 413 U.S. 189, 201–03, 211–13, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Oliver v. Kalamazoo,* 508 F.2d 178, 183–84 (6th Cir. 1974), *cert. den'd,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). In finding that the defendants helped to create racially segregated housing, this Court specifically rejected the defense argument that the schools were segregated because the neighborhoods were segregated.

Housing and school segregation is discussed by the Court in 422 F.Supp. at 788–90. The Court's findings and conclusions reflect testimony given during the trial at transcript pages 701 *et seq.*; 784 *et seq.*; 848 *et seq.*; 976–87; 1388–96. Additionally, the Court relied upon the following plaintiffs' exhibits which were not credibly refuted by the defendants: 123, 130, 154, 164, 171, 185, 210, 222, 223, 225, 244, 323, 332, 387.

## Q. THE ROLE OF THE STATE DEFENDANTS

The Court reviewed the allegations of state involvement in the pervasive racial segregation found to have been created in the Cleveland Public School System. This Court was unpersuaded by the assertions of the state education officials that they had been ignorant of either the actions being illegally taken at the local level, or of their own powers and responsibility in the face of such actions. The Court also found that the state officials, on more than one occasion, gave explicit approval to the racially segregative policies and practices of the local defendants, as when permission was granted to contain black children in overcrowded black school houses in "relay classes" under circumstances in explicit violation of state minimum standards. The Court also rejected the argument of these defendants that their responsibility extended only to suggestions, and that they were powerless to effect a reduction or elimination of the widespread racial segregation they knew to exist. The record disclosed that these officials, in the face of an Ohio Attorney General's Opinion spelling out their duty to act against racial segregation they knew to exist, chose not to know, and then attempted to convert their calculated ignorance into a constitutional defense. This Court deter-

mined on the evidence that the State educational officials had responsibilities which, in some instances, exceeded the local responsibilities to avoid racial segregation, but that these officials took no action to compel change. *See Brinkman v. Gilligan,* 503 F.2d 684, 704 (6th Cir. 1974).

The Supreme Court, after the initial opinion of this Court finding local and state liability for *de jure* segregation, decided *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). In that opinion, the Supreme Court not only confirmed the state responsibility in the area of public education, but affirmed the responsibility of the state to help pay whatever reasonable costs are associated with undoing the unconstitutional wrongs their default or conduct might have helped create.

The role of the State Board of Education is discussed in this Court's August, 1976 Opinion in 422 F.Supp. at 793–96. The evidence on which the findings are based includes testimony at TR 1603, 2278, 2309–21, 2332, 3561, and 3583; and defendants' exhibit 2013.

### IV.

In summary, the Court finds that the above cited instances and other instances detailed in this record constitute "action in the conduct of the [City and State] school board[s] which was intended to, and did in fact, discriminate against minority pupils, teachers or staff. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)." *Dayton, supra,* 97 S.Ct. at 2775. The defendants' intentional discriminatory action has infected every part of the system, mandating the finding that defendants have operated a *de jure* segregated dual school system in Cleveland. These findings satisfy the mandate of the Court of Appeals on remand.

■ The violations detailed herein provide "the necessary predicate for the entry of a remedial order . . . and, indeed [impose] a duty on the District Court to grant appropriate relief." *Hills v. Gautreaux,* 425 U.S. 284, 297, 96 S.Ct. 1538, 1546, 47 L.Ed.2d 792 (1976). Findings of

systemwide *de jure* segregation mandate a comprehensive, systemwide plan of actual desegregation which eliminates the systematic pattern of schools substantially disproportionate in their racial composition to the maximum extent feasible. *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *Keyes, supra; Davis v. Board of School Commissioners,* 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971); *Swann, supra; Alexander v. Holmes County,* 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969); *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 565, 19 L.Ed.2d 598 (1968).

As the Supreme Court recently observed:

> Our prior decisions counsel that in the event of a constitutional violation "all reasonable methods be available to formulate an effective remedy," *North Carolina State Board of Education v. Swann,* 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586, 589, and that every effort should be made by a federal court to employ those methods "to achieve the greatest possible degree of [relief], taking into account the practicalities of the situation." *Davis v. School Comm'rs of Mobile County,* 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577, 581. As the Court observed in *Swann v. Charlotte-Mecklenburg Board of Education* : "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." 402 U.S., at 15, 91 S.Ct., at 1276.

*Hills, supra,* at 297, 96 S.Ct. at 1546.

The accompanying Order, adopting in most respects the desegregation plan recommended by the Special Master on October 27, 1977, satisfies this mandate. Before turning to the question of remedy, however, there is one final matter which should be addressed herein.

During the course of the trial, the Court permitted discussion of certain matters not directly relevant to the issues of liability. It did so hoping it would serve to enlighten the public. With the same hope, it now

offers these comments. Throughout this litigation, defendants have warned the Court that even if they were found liable the desegregation of pupils would prove counterproductive. They have argued that extensive pupil reassignment would interfere with the management of the district by its highly competent administration. The costs of desegregation would jeopardize the district's financial stability maintained through efficient financial procedures which were a model for urban school systems. And, pupil reassignment on any substantial scale would threaten the quality of education causing lower academic achievement.

Developments since liability of the defendants was established reveal that the picture of managerial competence, financial soundness, and quality education painted by the defendants was nothing more than sheer fantasy. The Special Master's efforts to dig into the operations of the school system, at times rivaling Hercules' confrontation with the Augean stables, show a quite different picture. The administrative procedures for determining and implementing educational policies are formless. To the extent they exhibit a design, it is one of lack of managerial skill in administration. The financial system has proved to be primitive. Its hopeless inadequacy might by itself explain the financial chaos that confronts the district in the form of a 1977 year-end operating deficit approaching $50 million. None of this deficit results from desegregation. The educational programs asserted to produce academic excellence have instead produced levels of performance by students low enough to be characterized by the Cleveland Plain Dealer as "scandalous."

It is painfully clear that no amount of desegregation could harm this school system. It is the sincere hope and belief of the Court that when desegregation comes and the constitutional rights of plaintiffs are restored, the rights of all pupils and parents to administrative competence, financial stability, and academic excellence will also be restored.

The Clerk is instructed to forward this Opinion forthwith to the Court of Appeals for the Sixth Circuit.

IT IS SO ORDERED.