Robert A. REED et al., Plaintiffs,

v.

James A. RHODES et al., Defendants.

No. C73–1300.

United States District Court,
N. D. Ohio, E. D.

Sept. 23, 1980.

See also, D.C., 500 F.Supp. 363.

James L. Hardiman, Theresa Demchak, Cleveland, Ohio, Thomas I. Atkins, NAACP, New York City, for plaintiffs.

Michael Sussman, Civ. Rights Div., Dept. of Justice, Washington, D. C., for amicus curiae.

Daniel R. McCarthy, Cleveland, Ohio, Special Master.

James P. Murphy, George I. Meisel, William H. Baughman, Jr., Squire, Sanders & Dempsey, Cleveland, Ohio, Mark O'Neill, Weston, Hurd, Follon, Paisley & Hawley, John Bustamante, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

On August 23, 1979, the Court of Appeals for the Sixth Circuit remanded for further consideration this Court's findings that the Ohio State Board of Education and the Superintendent of Public Education were liable for the intentional segregation of the Cleveland public schools. *Reed v. Rhodes*, 607 F.2d 714 (6th Cir. 1979), *cert. denied*, 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980). Accordingly, additional hearings were held from April 21 to April 24, 1980 on the issue of whether the State defendants violated the plaintiffs' Fourteenth Amendment right to equal protection of the laws.

### I.

In 1976, this Court found both the Cleveland Board of Education, its members, and Superintendent ("Cleveland defendants") and the State Board of Education, its members and Superintendent ("state defendants") liable for intentionally and deliberately operating a racially dual public school system in the City of Cleveland. 422 F.Supp. 708 (N.D.Ohio 1976). This determination of liability was appealed to the Court of Appeals for the Sixth Circuit, which re-

manded the case back to this Court for further consideration in light of the intervening Supreme Court decision of *Dayton Board of Education v. Brinkman, (Dayton I)*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 85 (1977). 559 F.2d 1220 (6th Cir. 1977).

Upon reconsideration, the original findings were carefully reviewed, affirmed and readopted, 455 F.Supp. 546 (N.D.Ohio 1978) and a Remedial Order was issued. 455 F.Supp. 569 (N.D.Ohio 1978). The state defendants again appealed from both the Remand and Remedial Orders.

In its August 23, 1979 decision, the Court of Appeals affirmed this Court's findings of intentional systemwide segregation with respect to the Cleveland defendants. *Reed v. Rhodes*, 607 F.2d 714 (6th Cir. 1979), *aff'g in relevant part*, 422 F.Supp. 708 (N.D.Ohio 1976), *cert. denied*, 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980). However, with regard to the liability of the state defendants, the Sixth Circuit Court of Appeals wrote:

> While in some respects the findings of segregative purpose on the part of the state serve to meet the Dayton requirements, [*Dayton Board of Education v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 85 (1977)], Dayton appears to us to negate a state liability finding entered principally on the ground of failure of the state to compel its subdivision to comply with the United States Constitution. As we have indicated in the Columbus opinion, [*Penick v. Columbus Board of Education*, 583 F.2d 787 (6th Cir. 1978), *aff'd* 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979)], knowledge by the state of intentional segregative practices on the part of the local board and intentional support of the local board in pursuing such practices appear to be requirements for a finding of constitutional violation. For these reasons, the question of state board liability is again remanded to the District Court for answers to the questions posed in *Penick v. Columbus Board of Education*.

607 F.2d at 718.

In *Penick v. Columbus Board of Education*, 583 F.2d 787 (6th Cir. 1978), *aff'd* 443

U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979), the Court of Appeals developed the following guidelines to determine the question of state liability:

> 1) The State Board's knowledge (if any) of the Columbus Board's intentional segregative practices, 2) the State Board's failure to protest or restrain them by withholding funds, 3) the State Board's continuance of support in the face of such knowledge, 4) the motivation of the State Board in failing to investigate the reasons for de facto segregation, and 5) the effect of findings if any, under 1, 2, 3 and 4 above, as suggested in [*Dayton Board of Education v. Brinkman*, 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 85 (1977)].

583 F.2d at 818.

On remand, the plaintiffs' basic position is that the state defendants possessed substantial information regarding the existence of intentional segregation in the Cleveland public school district. Despite this information, they structured and operated the State Board of Education and the Department of Education in a manner which permitted them to fail to act upon this relevant and extensive information regarding the existence of dual educational systems in Cleveland and other municipalities in Ohio. The plaintiffs claim that such structuring and operation cannot serve to immunize the state defendants from liability solely because of the resulting lack of knowledge of segregative practices. The plaintiffs also contend that the information of intentional racial segregation in the possession of the state defendants is so overwhelming that knowledge can be imputed.

The plaintiffs are joined by the Cleveland defendants and the Department of Justice appearing as *amicus*, who argue that the state defendants had substantial knowledge of intentional segregative acts in the Cleveland public school district. Given this knowledge, the state defendants unlawfully and deliberately failed to enforce the State of Ohio's anti–segregation laws and supported intentional racial segregation in Cleveland.

The state defendants defend their actions by stressing the distinction between *de jure* and *de facto* segregation. They admit an awareness of racially unbalanced schools within Cleveland and large urban areas in Ohio. However, because such imbalances were considered *de facto* and therefore not violative of the Constitution, there was no obligation to investigate or take corrective action. The State defendants also claim that they possessed no knowledge of the Cleveland defendants' *de jure* practices, and defend their administration and procedures in the desegregation area.

## II.

### Racial Segregation in Ohio Public Schools

During the past decade, numerous courts have determined that local officials of Ohio public school districts engaged in intentional segregative practices in violation of the Fourteenth Amendment. *See e. g., Reed v. Rhodes*, 422 F.Supp. 708 (N.D.Ohio 1976), aff'd 607 F.2d 714 (6th Cir. 1979), *cert. denied*, 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980); *Penick v. Columbus Board of Education*, 429 F.Supp. 229 (S.D. Ohio 1977), *aff'd in relevant part*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); *Brinkman v. Gilligan*, 583 F.2d 243 (6th Cir. 1978), *aff'd*, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979). However, this intentional racial segregation in Ohio public schools is not a new phenomenon. It has deep historical roots in the laws and traditions of the State of Ohio which for many years treated blacks as inferior beings and second–class citizens. Recounting this history does not make pleasant reading but is critical to developing a proper understanding of the State's involvement in segregation. A brief summary will suffice.

Throughout the nineteenth century, the constitutions and laws of the State of Ohio were used to "regulate black and mulatto persons." 29 Stat. 439 (*See* Plaintiffs' Exhibit 3). Blacks were denied the right to vote, Const. of 1802, art. IV, § 1, Const. of 1851, art. V, § 1, the opportunity to serve on juries, Laws of Ohio 26:43, 29:43, the ability

to gain a legal settlement, Laws of Ohio 27:35 and the ability to testify in any court proceeding involving a white. *See, e. g. Gray v. The State*, 4 Ohio Rep. 353 (1831). The laws also placed restrictions on the right of a "Negro or mulatto person" to "emigrate or settle within this state," 29 Stat. 439, and established criminal and civil penalties designed to secure the right of slave owners in slaveholding states to recover slaves who escaped to Ohio. 37 Stat. 38. State law also was used "to prevent the amalgamation of the white and colored races" by declaring it unlawful "for any person of pure white blood to intermarry . . . with any . . . person having a distinct and visible mixture of African blood." Laws of Ohio 58:6.

Racial discrimination in the area of public education also was authorized by state law. The foundations for the public school system were established in 1821, Laws of Ohio 19:5, but black children were totally excluded from public education until 1848. (*See* Plaintiffs' Exhibit 1; 2). The early history of public education in Ohio was summarized by the Ohio Supreme Court in *Van Camp v. Board of Education of Logan*, 9 Ohio St. 406 (1859):

> Prior to 1848 there was not any legislative provision in Ohio for the education of any but the white youth resident in the various districts. Most of the previous statutes–and they are quite numerous– merely make provision for the instruction of the white youth, and exempt the property of blacks and mullatoes from taxation for school purposes, while some, like the act of February 10, 1829, [Laws of Ohio 27:72] in express terms, exclude blacks and mulattoes from the schools.

9 Ohio St. at 408–409.

It was not until 1848 that the State of Ohio passed legislation to provide public education for children of black residents. 2 Curwen Rev.Stat. 1428 (Plaintiffs' Exhibit 4). Shortly thereafter, a law "conceived in a more liberal and patriotic spirit", *Van Camp v. Board of Education of Logan, supra* at 409, was enacted which required local boards of education "to establish within

their respective jurisdictions, one or more separate schools for colored children." Act of 1853, Section 31 (Plaintiffs' Exhibit 8). While blacks were permitted to receive an equal per capita distribution of the common school fund, laws were passed designed to ensure that "colored" pupils were educated at separate schools. (Plaintiffs' Exhibit 6). This was done in Cleveland with the establishment of the Cleveland School District and the enactment of a law authorizing the Cleveland Board of Education "to provide separate schools for the colored youth of school who are residing in said city, apart from other schools." (Plaintiffs' Exhibit 10 A).

The deplorable state of race relations was described succinctly by the Supreme Court of Ohio in its 1859 *Van Camp* decision: "For nearly two generations, blacks and mulattoes had been a proscribed and degraded race in Ohio." 9 Ohio St. at 410. "Long years of hostile legislation and social exclusion" had resulted in racial apartheid, and "the prejudice of ages could not be dissipated by one or more judicial decisions" *Id.* at 410–411. Indeed, this prejudice was often reflected in judicial opinions such as *State ex rel. Garnes v. McCann*, 21 Ohio St. 198 (1871), in which the Supreme Court of Ohio unanimously upheld the validity of legislation which mandated racial segregation.

In 1887, following the passage of the Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution of the United States, the Ohio Legislature repealed the State's "Black Laws", including the provisions of the separate school act. Act of February 21, 1887, 84 Ohio Laws 34. However, while the Supreme Court of Ohio interpreted the legislation to mean that "separate schools for blacks have been abolished," *Board of Education v. State*, 45 Ohio St. 555, 556 (1888), previously established separate schools and separate school districts for black children were not abolished, nor was racially integrated education declared to be a policy of the State.

Despite the official repeal of the "Black Laws" in 1887, there is no evidence that the

State of Ohio undertook actions during the next fifty years to dismantle the separate schools. Rather, the record reveals that racially segregated public school education continued unabated. For example, Columbus school officials created a separate school for blacks in 1909, and staffed it entirely with black teachers. *Penick v. Columbus Board of Education, supra,* 429 F.Supp. 229. A black plaintiff's attempt to challenge this intentional segregative conduct was rejected by Ohio Courts. *Id.* In addition, Dayton public school officials began segregating students by race as early as 1912. *Brinkman v. Gilligan, supra,* 583 F.2d at 249.

Throughout the early 1900's, officials of the State of Ohio were aware that separate schools for black children were maintained in numerous localities. This is reflected in biennial reports submitted to the Governor of Ohio by the Ohio Director of Education (the predecessor of the current office of Superintendent of Public Instruction) from 1929 to 1941. (Plaintiffs' Exhibits 21–25 and Defendants' Exhibits 1–6). These reports contained the separate enrollment figures for blacks and whites. Significantly, the 1929–31 report expressly noted that "the enrollment in special schools for colored children was 1,269 for Columbus and 1,318 for Cleveland". (Plaintiffs' Exhibit 21). The separate schools were operated in Cleveland despite complaints by black parents and leaders. Two separate special schools for black children–Longwood and Outhwaite–were justified by the Cleveland Board of Education on the ground that their purpose was to urbanize black children moving to Cleveland from southern states. (Plaintiffs' Exhibit [Liability] 224.) In fact, enrollment figures revealed that most of the children attending these schools were natives of Cleveland. *(Id.)*

Reports in subsequent years to the Governor and General Assembly demonstrate that separate schools were maintained in some municipalities. The 1933–35 report stated that "Ohio generally does not have separate schools for colored children. A few cities maintain separate schools for colored pupils." (Defendants' Exhibit 3). The 1935–37 report noted that "a few cities have separate schools for colored children in certain sections where the population is entirely colored." (Defendants' Exhibit 4). The 1937–39 report stated that "Ohio does not have many separate schools for colored children (Plaintiffs' Exhibit 24). Finally, the 1939–41 report (Plaintiffs' Exhibit 25) contained the following statement:

*Colored Teachers.* Ohio has very few separate schools for colored children. Ten cities reported the existence of separate schools for colored children. These schools are located in centers where the population is mostly comprised of colored people. The following cities reported separate schools–Cincinnati, Chillicothe, Columbus, Dayton, Gallipolis, Lockland, Mansfield, (classes only), Middletown, Portsmouth, Wilmington, and Xenia. Cincinnati and Columbus have a separate Junior High School for children in one locality, as well as elementary schools for colored children.

Despite repeated denials by the state defendants, the evidence shows that between 1940 and 1954 annual statistical reports were submitted to the State Superintendent of Public Instruction containing data on the racial composition of students and faculty in school districts throughout the state. (Plaintiffs' Exhibit 26). These reports asked local school districts to report the "Number of Separate Schools for Negroes," or "Number of Separate Schools for Colored Children". The State Department of Education also required principals to submit annual statistical reports which included information about the number of colored teachers and pupils in each principal's school, and required district superintendents to submit annual statistical reports which included information about "colored" teachers and pupils, and about separate schools for "colored" children (see Plaintiffs' Exhibits 33–39). Finally, the Department also required teachers to submit annual reports reflecting the number of colored children enrolled in their classes. (Plaintiffs' Exhibit 27).

The reports submitted between 1940 and 1953 indicate that at least twenty–six local school districts reported the existence of separate schools for black children. (*Id.*) At least forty–four separate schools were reported by these local school districts: forty elementary schools; two junior high schools, one senior high school, and one special school. (*Id.*) Those local school districts which reported the existence of separate schools–Dayton, Columbus, Hillsboro–were subsequently found to be operating unconstitutionally segregated school systems. *See Clemons v. Board of Education of Hillsboro*, 228 F.2d 853 (6th Cir. 1956); *Brinkman v. Gilligan, supra; Penick v. Columbus Board of Education, supra.*

The information submitted to the State Department of Education clearly establishes that separate schools existed in Ohio long after such schools had been formally abolished by law. Prior to 1954, the record shows no effort by the State of Ohio to enforce the 1887 law which abolished separate schools for blacks. Rather such schools, initially created by state law and enforced by state courts, were maintained by the policies, practices, and customs of local officials and with the knowledge of state officials.

### III.

A. Policies and Procedures of the State Defendants in Desegregation Matters in the years following *Brown v. Board of Education.*

The decision of the Supreme Court in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), was handed down at a time when the state educational structure was undergoing legislative change. In 1953, amendments to the Ohio Constitution provided for the selection of a State Board of Education and the appointment of a Superintendent of Public Instruction, with powers and duties prescribed by law. Ohio Const., art. VI, § 4. The Office of Superintendent of Public Instruction had been in existence under various titles since 1853 (Plaintiffs' Exhibit 19). Similarly, the State Department of Education, the admin-

istrative organization of the Superintendent and one of fifteen executive departments of the state government, had been in existence for numerous years. (*Id.*)

In order to comply with the State Constitutional mandate, the General Assembly enacted legislation specifying that the State Board of Education be comprised of twenty–three members, one from each of the congressional districts in the state. O.R.C. § 3301.04. The new State Board was given the authority to continue to employ all persons who had been in the Department of Education, and that authority was expressed by resolution. *Id.* (Plaintiffs' Exhibit 31).

During the 1930's and 1940's, the State of Ohio was aware that separate schools for blacks existed in numerous local school districts, including Cleveland, (Plaintiffs' Exhibits 21–26). The suggestion that the separate schools reported in the tables refer to "neighborhood schools" finds no support in the record and flies in the face of subsequent findings of other courts that separate schools did, in fact, exist. *See, e.g. Clemons v. Board of Education of Hillsboro, supra; Brinkman v. Gilligan, supra; Penick v. Columbus Board of Education, supra.* Thus from creation of the new organizational structure in 1954, the State Department of Education was staffed by persons who possessed knowledge of the existence of separate schools for blacks and had permitted such schools to be maintained.

From its inception, the State Board of Education showed no inclination to undertake affirmative actions to eliminate segregated school districts. During the first meeting of the new State Board on January 3, 1956, Mr. Charles Lucas, the Board's sole black member and a realtor from Cleveland, moved that the Board withhold state funds from any school district that practiced racial discrimination. The motion was defeated. On March 12, 1956, Mr. Lucas proposed that the State Board

"establish a committee of its own or its designees to obtain its own set of facts that segregated schools exist in the State

of Ohio. Perhaps we don't have jurisdiction in this matter. I should like to ask that we request the Attorney General to define whether or not we have any authority in this field."

(Plaintiffs' Exhibit 29).

This dual motion was defeated and in its stead the State Board declared, over Lucas' dissent, the policy it was to follow during the next two decades.

WHEREAS the determination of what constitutes unlawful segregation is a matter for judicial decision, and

WHEREAS the State Board of Education has neither the means nor the right to take action on this question without final determination by the courts,

BE IT RESOLVED THAT in any case where courts have made final determination that unlawful segregation exists, this Board would then take action in accordance with the law.

(Plaintiffs' Exhibit 29).

Mr. Lucas continued to press for a broader and more affirmative declaration of policy in the area of racial segregation. In May 1956, Mr. Lucas proposed another resolution as follows:

WHEREAS: The Supreme Court of the United States has clearly defined racial segregation in the public schools as unconstitutional, and

WHEREAS: The Supreme Court of the State of Ohio has ruled racial segregation in the public schools unconstitutional, and

WHEREAS: Remnants of racially segregated schools exist in Ohio, and

WHEREAS: The Ohio State Board of Education is specifically authorized in House Bill # 212 to administer the schools within the framework of existing law, and to regulate the admissions of pupils and to set up the highest possible educational standards for the public schools of Ohio,

BE IT RESOLVED: that the Ohio State Board of Education go on record as insisting that each public school under its jurisdiction operate within State and Federal laws requiring equality of treatment of all pupils, regardless of race, creed, or color under penalty of loss of state funds.'

BE IT FURTHER RESOLVED: that the Ohio State Board of Education, on and after September, 1956 will instruct the State Controlling Board to withhold funds from any school district which operates a racially segregated school in defiance of the public policy of the State of Ohio, the Ohio Supreme Court and the Supreme Court of the United States.

(Defendants' Exhibit [Trial] 2012)

During discussions concerning the resolution, Mr. Lucas declined to name any district practicing segregation, even though he believed that segregated school systems still existed in Ohio. (*Id.*) The proposed resolution was defeated, partly on the ground that Mr. Lucas had presented no proof that "remnants of racially segregated schools exist in Ohio."

Mr. Lucas' continued effort to push for stronger affirmative action from the State Board was opposed by other board members, who petitioned him to "abort the effort". (T. Tr. 2271). A compromise was reached in which an opinion of the Attorney General was sought with respect to four questions concerning the scope of the State Board's authority. (Defendants' Exhibit [Trial] 2012, p. 4.).

On July 9, 1956, the Attorney General issued the following opinion in response to the State Board's request.

1. The term 'law' as used in section 3317.14, Revised Code, forbidding the distribution of state funds to school districts which have not 'conformed with the law,' is used in the abstract sense and embraces the aggregate of all those rules and principles enforced and sanctioned by the governing power in the community. Such term embraces the equal protection provision in the Fourteenth Amendment of the Constitution of the United States under which *the segregation of pupils in schools according to race is forbidden.*

2. The *primary responsibility for administering the laws* relating to the distribution of state and federal funds to the several public school districts *is placed*

*with the state board of education,* subject to the approval of the state controlling board.

3. *It is the responsibility of the state board of education in the first instance to determine whether a particular school district, or the board of education of such district, 'has not conformed with the law'* so as to require the withholding of state funds from such district. In making such determination the state board of education should observe the requirements of the Administrative Procedure Act, Chapter 119, Revised Code, as to notice, hearing, summoning of witnesses, presentation of evidence, degree of proof, and procedural matters generally.

4. Following a determination by the state board of education that a school district 'has not conformed with the law' so as to require the withholding of state funds as provided in Section 3317.14, Revised Code, such board and the controlling board, acting separately, may, for 'good and sufficient reason' established to the satisfaction of each board, offer a distribution of funds to such district notwithstanding such lack of conformity with the law.

(Plaintiffs' Exhibit [Trial] 383) (emphasis added).

The Attorney General's opinion also specified the State Board's obligations in the area of racial segregation.

"It follows, therefore, that *in those cases in which your board finds as a matter of fact that racial segregation exists* in a particular school district, the restrictive provisions of section 3317.14, Revised Code, *must* be deemed to apply."

(*Id.*) (emphasis added)

Despite knowledge of its "affirmative duty under both Ohio and Federal laws to take all actions necessary to prevent and eliminate racial segregation in public schools," *Brinkman v. Gilligan,* 503 F.2d 684, 704 (6th Cir. 1974), the State Board deliberately chose to follow procedures which enabled it to evade its lawful responsibilities.

Both the State Board and Department of Education operated on the assumption that local school districts carried out their responsibilities in accordance with law. (Tr. 490–492) The assumption was that local school administrators were knowledgeable concerning their duties under the United States Constitution and laws of the State, and that statements submitted to the department which indicated full compliance with all laws were essentially accurate. (*Id.*) The State defendants argue that this assumption was reasonable because it was based on personal relationships between state and local school officials extending over a period of time, audits conducted by the State Auditor which rarely revealed that schools were operated unlawfully, efforts of local district administrators to be in compliance with the State Board's minimum standards, and local school assurances upon application for federal funds that such funds shall not be used in a racially discriminatory manner. (Tr. 528–529, 547–552).

In order to challenge the continuing assumption of legality in a particular school district, a complaint had to be filed regarding a policy or practice in the district that appeared to be in violation of law. (Tr. 629). The position of the State Board was that it would take no action against a school district unless a complaint was filed in which the complainant produced significant evidence of a violation of a state or federal law (Tr. 481–482, 499), or complained of a practice already determined by a court to constitute illegal or unconstitutional action. (Tr. 781–782).

Absent such a complaint, neither the State Board nor Department of Education permitted an investigation to be conducted into whether state or federal laws were being violated by the illegal segregation of school children. (Tr. 547).

A "concern" or a "request for information" as opposed to a "complaint", addressed to the State Board was handled informally by giving information to the interested parties. Statements or comments which did not provide information, evidence, statistical analysis or language suffi-

cient to prove a *prima facie* case of *de jure* segregation were relegated to the status of "concerns" or "requests for information." (Plaintiffs' Exhibit 30, *see* pp. 419 420, *infra*). Nor was the complaint procedure ever publicized by press release or administrative rule. Consequently, there was never any public awareness of the mechanism for filing a complaint. The determination of whether to characterize a submission or presentation as a "complaint" or merely as a "concern" or "request for information" rested in the uncontrolled discretion of the State Superintendent for Public Instruction. (Tr. 590).

Given the history and scope of racial segregation in Ohio, the assumptions and procedures employed by the State defendants were clearly insufficient to carry out the affirmative duties imposed by federal and state law. The core assumption of legality clearly was unreasonable in the area of race, where statistical data prepared by the State defendants indicated the existence of separate schools sixty years after the State of Ohio had officially abolished them. The elimination of data on race between 1954 and 1968 did not eradicate the pre–1954 knowledge of illegality and render the assumption valid. The fact that state audits suggested general compliance with laws in no way bolsters the assumption of legality. No evidence was presented that the audits ever addressed the use of funds for segregative purposes. Rather the evidence suggests that the state audits covered the more traditional areas of construction, salaries, supplies, etc. Similarly, the State Board's reliance on assurances provided by local districts in order to receive federal funds was unjustified. Many of these same local districts knowingly had unlawfully operated separate schools for black children in the post–Black laws era, and could not reasonably be expected to monitor themselves.

The complaint procedure also was structured in such a manner that complaints would either not be filed or would not be acted upon. The State Board never established a written complaint policy or procedure (Tr. 589, 637). On at least one occasion, persons who believed they had made a "complaint" regarding racial segregation in Cleveland discovered that their complaint had been treated as a "request for information." *See* pp. 419–420, *infra*.

The effectiveness of the State Board's complaint procedure was limited because the Board never publicized its "primary responsibility" under the 1956 Attorney General's opinion to determine "in the first instance" whether a particular school district had not conformed with the law, nor did the Board ever hold a formal session outside of Columbus. Even if the State Board had attempted to inform the public of the time and location of its meetings (Tr. 158–159, 580–581), the failure to publicize its responsibility in matters of school segregation and the manner of handling such "complaints" insured that few complaints of racial segregation came before the Board. The evidence indicates that while the complaint procedure was allegedly designed to permit open discussion (Tr. 740), members of the State Board (Tr. 321) and Department of Education (Tr. 321–324) discouraged individuals making oral presentations from naming names or specifics in order to avoid embarassing individuals in the local district.

Operating under an unwarranted assumption of legality in racial matters and a complaint procedure not structured to uncover instances of racial segregation, it is not surprising that few "complaints" were ever brought before the State Board. The North College Hill complaint, filed in 1964 and claiming blatantly illegal segregation of black elementary school children in separate buildings (T. Tr. 3586) represented the sole instance where the State Board ordered an investigation and corrective action. (State Defendants' Exhibit 11). An earlier 1963 complaint attacking the use of "intact busing" in Cincinnati had resulted in the State Board's deferring action until the complainants had obtained a judgment from a court that segregation existed. (Plaintiffs' Exhibit 41). This State Board inaction occurred even though former State Superintendent Essex identified "intact busing", a procedure which isolated an en-

tire class of one race from the rest of the students in a receiving school of the opposite race, as an obvious example of illegal *de jure* segregation which deserved immediate attention and action by the State Board.

The State Board and Department of Education claim that no one had ever lodged a "complaint" with them suggesting that illegal segregation existed in the Cleveland public school district. (Tr. 277; T. Tr. 3582–3584) Consequently, under established policy, no investigation and determination of facts was made about the existence of intentional segregation in Cleveland. The Court finds the position of the State defendants unsupportable for two reasons. First, under procedures employed by the State Department of Education, the filing of a "complaint" has never been a pre–requisite to administrative investigations and the utilization of corrective actions. Second, evidence presented during both the initial liability trial and the remand hearings demonstrates that the State defendants were made aware of the existence of significant problems of intentional segregation in the Cleveland area but deliberately and consciously chose not to pursue any investigation.

In defending their conduct regarding the Cleveland school system, the state defendants repeatedly have told this Court that no formal "complaint" has ever been made to them regarding segregation in Cleveland. However, in defending their conduct in general in the area of race, the State defendants stress the fact that on numerous occasions actions have been taken to eliminate segregative practices in local districts absent the lodging of a complaint. This is claimed to have occurred in Middletown, in Dayton, and in Toledo. (T. Tr. 5842–5843, 3956–3957, 3955–3956) In addition, the defendants claim they have denied transfer applications in Newburg Heights (T. Tr. 3925), Youngstown (T. Tr. 3926–3927), and Springfield, (*Id.*) in order to prevent increased racial isolation and have brought about the consolidation of school districts which have had an integrative effect. (T. Tr. 3928–3934).

In explaining the procedure whereby the State Department of Education determined to act administratively, former State Superintendent Essex noted that the Department first had to learn of the alleged violation of law by a protest of some kind. (T. Tr. 3953–3954). This protest might take the form of telephone calls, letters, petitions, delegations, and H.E.W. compliance discussions. (*Id.*). After the department learned of "a complaint or protest or an indication of some kind that somebody is unhappy about something and that there is a possible violation of law" (*Id.*), former Superintendent Essex stated that the Department "*may* send a person or group of persons to take a look. I *may* pick up the phone and talk with the [local] Superintendent and ask him for the facts." (*Id.*)

The significance of the availability and use of informal administrative mechanisms is threefold. First, it contradicts the position taken by the State defendants during the remand hearings that the absence of a "complaint" prevented them from investigating school segregation in Cleveland. Second, it indicates that information of unlawful conditions could be and actually was made available to the State Department of Education by means other than "formal" complaints. Third, it suggests the highly discretionary nature by which administrative process was used to deal with problems of racial segregation in Ohio public schools.

The designs and operation of the procedures for triggering an investigation prevented highly relevant and necessary information from ever reaching the State Board of Education. Despite this attempt to shelter the state defendants from information regarding segregative practices the record reveals convincingly that on numerous occasions such information was in the possession of the defendants. *See* pp. 416–420, *infra.* However, on those occasions, the state defendants chose not to pursue any meaningful inquiries to ascertain the existence of such practices, opting instead for a policy of calculated ignorance, and therefore, inaction.

B. Policies and Procedures of the State Defendants in Non–Desegregation Matters.

The conduct of the state defendants in the area of desegregation varies substantially from their conduct in other areas. Except for duties concerning desegregation, the defendants vigorously exercised the full scope of their powers in fulfilling their obligations. This is evidenced most clearly in the promulgation of minimum standards for all public schools in Ohio to insure uniform high quality of education.

It is the obligation and statutory duty of the State Board of Education to formulate and prescribe minimum standards for all elementary and high schools in Ohio "for the purpose of requiring a general education of high quality" for all of the pupils within the State. The State Board is additionally required to exercise leadership in the "improvement" of public education in Ohio, and toward that goal the legislature has suggested that the required minimum standards be established in a broad spectrum of areas, and has been very careful not to confine the possible areas to only those suggested in the legislation. The areas suggested include, but are not limited to, the certification of teachers; curriculum and materials; buildings and their contents; admission, assignment, promotion and graduation of pupils; and "such other factors as the board finds necessary." O.R.C. §§ 3301.07(B) and 3301.07(D). As this Court has previously noted, the State defendants admitted that, although having the power to do so, they never promulgated minimum standards regarding racial segregation of pupils, faculty, staff, or use of facilities. 455 F.Supp. at 557.

Through its chartering powers, the State Board and Department have aggressively enforced minimum standards. As part of the chartering process, actual on–site inspections of secondary schools are conducted every three to five years. This inspection includes the physical examination of the facility and conversations with faculty and administrators. Prior to the opening of a new school, an evaluation is made and a report sent to the State Department containing information of expected pupil and faculty populations, including the racial composition of each. This inspection process is ongoing and provides the State defendants with visual and statistical knowledge of the composition and racial makeup of pupil and teacher populations. (T. Tr. 2348, 2351–2354). If a local school district does not meet the minimum standards promulgated by the State Board, the Board may revoke the district's charter or withhold funds from the district. The State Board is also empowered, upon revocation of a school's charter, to "dissolve the school district and transfer its territory to one or more adjacent districts." O.R.C. § 3301.16.[1] Thus, had the State Board not ignored the racial segregation rampant in the Cleveland school system, it could, quite properly, have dissolved the district and transferred its territory to adjacent districts, whereby a fully integrated metropolitan school system could have been realized. The State's failure to act left the Cleveland school system racially isolated.

The State Board of Education has vigorously exercised its chartering powers. Between 1955 and 1974, the number of state–chartered school districts in Ohio has diminished from over 1265 to 617. This reduction has been the result of various State Board actions, including: the vigorous use of powers to revoke charters for non–compliance with promulgated minimum standards, the use of powers to force the voluntary abandonment of charters after confrontation over compliance with minimum standards, and the consolidation of two or more districts, often after a determination that one of the districts is not complying with minimum standards. (T. Tr. 2309–2323).

In addition to exercising powers relating to minimum standards, the State Board also has successfully urged enactment of legisla-

---

1. Qualified electors in the district to be transferred, equal in number to a majority of the qualified electors voting in the last general election, may file a petition of referendum against the transfer. O.R.C. § 3301.161.

tion in the education area. This has been accomplished by the statutory power to recommend legislation to the Governor and the General Assembly in areas identified as of public or state interest in the field of education. O.R.C. § 3301.07(B). Legislation recommended by the State Board has been enacted in the areas of vocational education, teachers education and certification, funding for disadvantaged pupil programs, etc. (T. Tr. 2388, 3939–3950).

The State Board of Educations' powers are not limited to establishing minimum standards and recommending legislation. It also has the statutory power to administer and supervise all allocations and distributions of state and federal funds for public school education. O.R.C. § 3301.07(C).

C. Use of Traditional Powers in Desegregation Matters

Since 1956, the state defendants have been aware of their obligation under the Constitution, see Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958), and State law, see Attorney General's Opinion, (Plaintiffs' Exhibit 383 [Trial]) to insure that state monies were not being used to segregate school children illegally. The State defendants' duty in the area of desegregation also arose with Title VI of the Civil Rights Act, 42 U.S.C. § 2000d et seq. (1974), which was enacted in 1964 and which prohibited racial discrimination in any program receiving federal funds. To receive funds under Title VI, a local school district is required to report fully to the State Board and Superintendent concerning affirmative action and equal opportunity plans, and to indicate compliance in all matters. The State Department of Education is responsible for investigating these statements on behalf of the appropriate federal agency. O.R.C. § 3301.07(C); 45 C.F.R. § 80.4(b)(2), (T. Tr. 2300–2307).

Despite possessing the legal authority and powers to address fully the existence of racial segregation in Ohio public schools, the state defendants deliberately chose not to exercise such authority and power to carry out their affirmative duty. They were able to continue approving charters for the Cleveland public school system by not imposing and enforcing minimum standards dealing with desegregation. In the process, they approved the chartering of twenty–seven new schools in Cleveland, each of which was opened in a deliberately segregated manner as previously found by this Court. 455 F.Supp. 546, 561.

In the area of recommending legislation, it is noteworthy that the State Board never once proposed or endorsed legislation designed to decrease racial violation or eliminate segregative practices. This omission is glaring when compared to the State Board's involvement in recommending other legislation (e. g. lunch programs).

Finally, in the area of state and federal funding, the record shows no meaningful effort by the State Board to comply with the obligations imposed by the Constitution, federal statute and state law. For example, between 1964 and 1968, the State Board simply assumed that districts receiving federal funds were complying with Title VI of the Civil Rights Act. (Tr. 548–549). And since 1968, the State Board has relied on audits conducted by the State Auditor, even though these audits were not structured to determine the existence of discrimination in the operation of programs. (Tr. 351). The "enforcement" obligation of the State defendants has been conceived of as requiring simply desegregation assistance to local communities. Thus the State Board or Department conducts seminars and conferences and undertakes other efforts designed "to create an awareness that may not have existed with regard to the statutes." (Tr. 545).

IV.

A. State Defendants' Knowledge of Intentional Segregative Practices in the Cleveland Public School District.

█ The state defendants' policies and procedures which limit their access to information of specific segregative practices were incapable of providing total insulation from extensive evidence from various

sources indicating the existence of intentional segregative practices in the Cleveland public school district. The scope of the unconstitutional conditions and the thousands of people affected insured that some information trickled through to the defendants. However, even when confronted with such information, the State defendants preferred a condition of ignorance and failed to take appropriate steps to investigate and correct the problems.

The Court finds that the State defendants either (1) had knowledge of the existence of substantial intentional segregative practices by the Cleveland defendants, or (2) were confronted with information of such magnitude that such knowledge could be imputed to them; and that their failure to investigate and to correct the violations was intentionally supportive of such practices.

This finding is based on the following:

1) As early as 1930, the State defendants were aware that the Cleveland Board of Education was operating special schools for significant numbers of black children. (Plaintiffs' Exhibit 21). These separate schools were being maintained long after the General Assembly and Supreme Court of Ohio had declared separate schools to be abolished.

2) In the late 1950's the State defendants granted a waiver to the Cleveland Board of Education from compliance with minimum hour–per–day standards. This permitted the Cleveland defendants to provide less than the required daily hours of education to students in overcrowded schools, the great majority of whom were black. This Court has previously found this action to be an intentional segregative act on the part of both the State and Cleveland defendants. 422 F.Supp. 708, 793; 455 F.Supp. 546, 565 (remand opinion).

The state defendants repeatedly have contended that they never were advised of the number or identity of the schools, or the race of the pupils involved. However, evidence now indicates that the State defendants did request the "names of schools and grade levels" to be affected (Plaintiffs' Ex-hibit 28) and no evidence suggests that this evidence was not produced. Moreover, at all times the State Department of Education had access to relevant data regarding the schools to which waivers were granted.

3) In 1967, a report on "Racial Isolation in the Cleveland Public Schools" was prepared by Dr. Willard Richan of Case Western Reserve for the United States Commission of Civil Rights. (Plaintiffs' Exhibit 224 [Trial]). This report detailed certain intentionally segregative acts performed by the Cleveland Board of Education. (Tr. 225). Unbelievably, the State defendants claim they were never aware of such a study until the original liability trial in 1976. (Tr. 223–224). However, evidence indicates that this study was mentioned in a public presentation to the State Board of Education on racial problems in the Cleveland public schools in April 1970. (Plaintiffs' Exhibit 46). Specifically, the question was posed to the State Board: "Do you make use, for example, of U. S. Civil Rights Commission findings on policies of the Cleveland School System?" (*Id.* at 2). The fact that no copy was requested and no questions were asked regarding the findings cannot shelter the state defendants from knowledge of the existence of the report. This represents another example of highly relevant information concerning segregation made available but not pursued by the state defendants.

4) In 1970, racial tension in the Collinwood area of Cleveland in Collinwood High School reached a point where the Cleveland Police were no longer able to control the violence and the National Guard had to be alerted and stationed in the area. (Tr. 311–314, 442; Plaintiffs' Exhibit 47; 48). The adamant refusal of the Cleveland Board of Education to reassign black students from overcrowded, all–black Glenville High School to adjacent, underutilized and predominantly white Collinwood High School contributed to this tension. (Tr. 3945–3960 Plaintiffs' Exhibit 60).

The racial problems confronting the Collinwood and Glenville High Schools in Cleveland prompted concerned parents to

seek assistance from the federal government. On April 10, 1970, a letter was sent to civil rights specialist Leonard Hamilton of the Department of Health, Education and Welfare by the Glenville Task Force on Education and the Collinwood Committee of Black Concern. (Plaintiffs' Exhibit 55). That letter requested the withholding of federal funds from the Cleveland Board of Education because of various segregative practices, including: discriminatory gerrymandering of the Collinwood High School district; discriminatory transfers of black students out of Collinwood High School; disproportionate black faculty; and overcrowding of all–black Glenville High School resulting in inferior facilities and education. (*Id.*). It stated that members of the community would "be pleased to present evidence to support our claims of discriminatory practices in the Cleveland schools." (*Id.*)

A copy of this letter calling "for an investigation of discriminatory practices in the Cleveland School System" was sent by Mrs. Gaines to Robert Greer, Assistant Superintendent of Urban Education, on April 27, 1970. (Plaintiffs' Exhibit 56). Despite receipt of this letter detailing specific claims of segregative practices, the State defendants undertook no investigative or corrective actions. The State Superintendent was "not really sure of what happened with HEW" (Tr. 570) and claims that he was not informed of the contents of the HEW letter (Tr. 572).

Fortunately, the Department of Health, Education and Welfare did undertake to investigate the complaint of the Collinwood and Glenville parent groups. Its investigation revealed that

(1) Some education services provided to students at Glenville are not equal to those provided at Collinwood, (2) pupil assignment and boundary practices have created an overcrowded school at Glenville and an underutilized school at Collinwood.

HEW's report concluded that "[t]he comparison between Glenville High School, 100 percent minority, and Collinwood High, 30 percent minority, indicates that an unequal situation exists between the two schools," in eight areas, including equipment, library facilities, vocational course offerings, counselling, special education, and faculty assignments.

(Plaintiffs' Exhibit 62).

The evidence presented with regard to the HEW letter and finding indicates that Assistant Superintendent Greer did have knowledge of substantial claims of segregation in the Cleveland public schools. However, consistent with a policy of calculated ignorance and inaction, no investigation was ever conducted.

5) Parental concern over the situation at Collinwood and Glenville High Schools did not end with a letter being sent to the Department of Health, Education and Welfare. Fortuitously, two concerned parents, Mr. Rufus Pierce and Mrs. Edith Gaines, were informed by Mildred Madison, a newly elected black member of the State Board of Education from Cleveland, that they could appear before the State Board of Education. (Tr. 315–317, 398). Mr. Pierce and Mrs. Gaines told Mrs. Madison that they wished to complain about deliberately segregative student and faculty assignment plans in Cleveland. (Tr. 321–322). Mrs. Madison discouraged them from raising general claims of segregation in the Cleveland public schools with the State Board, and advised them that State Board members had little power or influence and therefore that there was little likelihood of help from the State. (Tr. 398–399). Mr. Pierce and Mrs. Gaines also were advised about the form which their prepared statements should take. (Tr. 399). This advice was followed even though both parents wished to say more about the problems of racial segregation and discrimination in Cleveland.

(Tr. 321, 402).

On April 13, 1970, the day of their presentation to the State Board of Education, Mr. Pierce and Mrs. Gaines met with Assistant Superintendent of Urban Education Greer. (Tr. 318, 427). During this meeting, Mr. Greer instructed both of them as to what they were permitted to say to the State

Board. Mr. Pierce, for example, testified that he indicated to Mr. Greer that he wished to discuss "violence and segregation in the Cleveland Public Schools, especially at Collinwood." (Tr. 321); the number of black employees in the system; the racial treatment of students; and desegregation of the system in general. (Tr. 323–324). He was advised by Assistant Superintendent Greer that he "could only ask questions", "could not name names or places," and "could not discuss specific cases of isolated segregation." (Tr. 321–324). Rather, his remarks were to be "general" (*Id.*) and all "harsher" words had to be deleted. (Tr. 356). Mrs. Gaines, on the advice of Mr. Greer, actually deleted references to overcrowding and segregation at Glenville High School and the absence of multi–cultural curriculum and materials at Collinwood High School. (Tr. 423–440; Plaintiffs' Exhibit 61).

During their five–minute presentations to the Board, the two parents were still able to raise serious questions about the problems of racial segregation in the Cleveland public schools and the inability or unwillingness of the Cleveland Board of Education to respond to these concerns. (Plaintiffs' Exhibit 46). Consistent with the suggestions of Mrs. Madison, both parents structured their presentations to follow the Board's 1968 Policy Statement on Equal Education Opportunity. (*Id.*). During the public session, no board member asked any questions or requested specific details about the problems of the Cleveland public schools. (Tr. 332, 409).

After presentation to the State Board, Mr. Pierce and Mrs. Gaines met with Assistant Superintendent Greer, Board Member Mildred Madison, a representative of the Department of Justice, and others. (Plaintiffs' Exhibit 49). Mr. Greer was asked to come to Cleveland to provide assistance to local school officials, and responded that such a trip required an invitation from the local officials. (Tr. 400–401).

Subsequent to the April 13, 1970 State Board meeting, Assistant Superintendent Greer prepared a memorandum to Superintendent Essex containing follow–up replies to the questions asked by Mr. Pierce and Mrs. Gaines. A copy of this memorandum was sent to Mr. Pierce and Mrs. Gaines, as well as to Cleveland Superintendent Paul Briggs. (Plaintiffs' Exhibit 49; Tr. 333–339, 409–410).

Both Mr. Pierce and Mrs. Gaines felt that their presentation to the State Board constituted a "complaint" (Tr. 325, 330). They were seeking help from the State Board to ease the racial tensions that had so recently erupted in violence in the schools. They were after assistance, not information about what the State Board had done in the past. (Tr. 330, 353). However, they were never told of any technical or procedural requirements needed to raise their presentation to a "complaint," as opposed to a "concern" or a "request for information" (Tr. 325, 326). The response they received–the Greer–Essex memorandum–was regarded as an unsatisfactory response to their request for state help to solve the racial problems. (Tr. 340–341, 409–410).

Significantly, the Greer–Essex memorandum reveals that the State Department of Education had "been kept informed of the situation at Collinwood." (Plaintiffs' Exhibit 49, p. 1). The state defendants clearly were aware of the racial nature of the problem. Combined with the presentation made by Mr. Pierce and Mrs. Gaines, there is no doubt that the State defendants had knowledge of the existence of arguably segregative practices in Glenville and Collinwood High Schools.

The Greer–Essex memorandum also is significant in that it states with reference to the Collinwood situation: "Legal authority for the Department to function in a capacity other than advisory does not exist." (*Id.*) Such a statement was a clear misstatement of the legal authority under which the State Board and Department of Education operated. *See* Attorney General's Opinion, July 9, 1956; O.R.C. § 3301.07. It was effective, however, in convincing Mr. Pierce and Mrs. Gaines that the State's role in eliminating segregative practices was minimal and that their continued efforts to

secure assistance from the State defendants would be fruitless. (Tr. 432–435).

The conduct of the State defendants in dealing with the matters presented by Mr. Pierce and Mrs. Gaines merely reflects a deliberate policy of following procedures designed to insure that important information regarding desegregation is never available. While the State defendants refuse to investigate unless a formal complaint is filed, the requirements for the filing of such a complaint are never communicated to the public. And even if a "complaint" is attempted to be filed, the Superintendent has unbridled discretion to apply the label of "concern" or "request for information", neither of which trigger an investigation. In any event, the State defendants limit those who might otherwise press complaints by claiming that they can act solely in an advisory manner.

6) In 1968, the State Department of Education undertook a survey of each school and school district in the State. This survey was reported completely by June, 1970, and identified Cleveland as one of the ten most racially isolated school districts in the State of Ohio. (Plaintiffs' Exhibit 379 [Trial]).

7) In 1975, representatives for the State Department of Education participated in numerous meetings with representatives of HEW and the Cleveland Board of Education to discuss HEW's denial of Cleveland's application for Emergency School Assistance Act funding. (Plaintiffs' Exhibits 203; 204; 205; 206; 207 [Trial]). The application was denied because of the failure of the Cleveland defendants to incorporate an acceptable plan to reduce racial isolation in schools. (*Id.*) In the face of this extensive involvement by the State Department of Education and obvious awareness of the serious racial problems in Cleveland, the State defendants chose to deny that they had knowledge of any *de jure* segregation. The weight of the evidence clearly suggests otherwise.

The evidence reveals that the State defendants, or their employees, had knowledge of allegations of segregative acts in the Cleveland public schools, and information documenting the existence of such acts. In no instance did the State Board or Department determine to investigate such matters. Rather they chose to ignore information regarding the existence of such practices, opting instead for a policy of calculated ignorance, and therefore, inaction.

8) Members of the State Board of Education were made aware of the segregated nature of the Cleveland public schools in many and varied ways. Mr. Wayne E. Shaffer, who was a member of the State Board from its creation in 1956 to the present, testified that "we couldn't help but be aware that Cleveland had some very serious problems and that they were connected with minority matters. We know that. Dr. Briggs was before us many times. His predecessor and his predecessor's predecessor came before our board. We know that there were acute problems in Cleveland . . . . We know that there were schools that were predominantly black. We know that there were other schools that were predominantly white." (T. Tr. 3585)

B. State Defendants' Failure To Protest Or Restrain Intentional Segregative Practices of the Cleveland Board of Education By Withholding Funds.

Despite substantial knowledge suggesting that intentional segregation of black pupils was occurring in the Cleveland public school district, the State defendants never undertook efforts to protest or restrain the Cleveland defendants by threatening or actually withholding state and federal educational funds. The reasons are deeply rooted in the State Board's traditionally limited conception of its statutory and constitutional obligations.

Since at least 1956, the State defendants have had both the legal authority and obligation to prevent the distribution of funds to school districts which have not "conformed with the law." O.R.C. 3317.14, Attorney General's Opinion, July 9, 1956 (Plaintiffs' Exhibit [Trial] 383). Any doubts about the nature and scope of the State Board's powers and duties were dispelled by the Attorney General's Opinion

which had been solicited by the Board. The Board was advised that the term "law", as used in O.R.C. 3317.14, "embraces the equal protection provision in the Fourteenth Amendment of the Constitution of the United States under which segregation of pupils in schools according to race is forbidden." (*Id.*) Significantly, the Attorney General informed the State defendants that, "It is the responsibility of the state board of education in the first instance to determine whether a particular school district, or the board of education of such district, 'has not conformed with the law' so as to require the withholding of state funds from such district." (*Id.*).

Presumably to fulfill the obligations specified by law and reinforced by the Attorney General's Opinion, the State Board adopted certain policies and procedures to determine whether school districts had not "conformed with the law." First, it assumed that all districts were operating lawfully, an assumption not warranted by the history of school segregation in the State of Ohio. *See* pp. 412 -413, *supra*. Secondly, the State Board adopted a complaint procedure which permitted the Board to ignore substantial information regarding segregative practices if the State Superintendent decided not to describe a presentation or request as a "complaint". *See* pp. 412 414, *supra*. By these two policies, the State defendants were able to insulate themselves from relevant information and structure their functions so as to preclude State investigations into alleged segregative practices.

In instances where no formal complaint was filed, the State defendants offered technical desegregation assistance to local school districts. This assistance included providing information regarding racial isolation to local school districts by means of monographs and mini–journals (Defendants' Exhibit 2003; 2004 [Trial]), workshops (T.Tr. 3806–3809) and on–site visits (T.Tr. 3814). Of course, this desegregation assistance was voluntary. The State defendants have provided the Court with no reason to believe that local officials who had committed intentional segregative acts would either request such assistance or, if requested, actually employ it to achieve desegregation.

While the policies and procedures of the State Board and Department might have been satisfactory in an abstract, incipient system, they were clearly insufficient for a public education system mired with the remnants of an official state segregative practice and local practices inconsistent with officially–declared state policy. In any event, the procedures were employed to justify the State Board's refusal to act in the face of growing evidence of non–conformity with the law in Cleveland.

The abdication of responsibility by the State defendants cannot be defended on the grounds of sound administrative practice. Pursuant to obligations imposed under federal and state law, the Board was required to ascertain a local district's conformity with law and cut off state funds if such conformity was not present. This the State Board failed to do.

C. The State Defendants' Continuance of Support to the Cleveland Public Schools in the Face of Knowledge of Intentional Segregative Practices.

A major portion of the State defendants' defense rests on the contention that neither the State Board nor the Department of Education had any knowledge of the Cleveland defendants' intentionally segregative practices. *See* Proposed Findings of Fact and Conclusions of Law of the State Board of Education and Superintendent of Public Instruction, pp. 2–4. And without this necessary knowledge, they had no basis to discontinue their financial and other assistance to the Cleveland public school district.

The State Board relies on a 1964 decision of this Court which, it is alleged, "absolved the Cleveland school system of the NAACP's charge of unlawful segregation." *Id.*, p.1. The Board cites *Craggett v. Cleveland Board of Education*, 234 F.Supp. 381 (N.D.Ohio 1964), *aff'd* 338 F.2d 941 (6th Cir. 1964). The Board argues that it was the holding of *Craggett* that whatever segregation existed at the time in the Cleveland

Public School System was *de facto* and hence not violative of the pupils' Fourteenth Amendment rights. Therefore, the argument continues, the Board had no duty to investigate the Cleveland school system or to eliminate the segregation there. The Board's reliance on *Craggett* was, and is, misplaced. First, *Craggett* involved the construction of three elementary schools in black neighborhoods which would, predictably, be attended predominantly by black students. The Court found that such construction was not intentionally discriminatory. The Court did not, and could not, find that the Cleveland Public School System as a whole was not illegally segregated. The case was decided on motion for preliminary injunction, and, as the Sixth Circuit noted in affirming the District Court, the case had not been heard on the merits, 338 F.2d at 942. Second, even were the Board's reading of the *Craggett* decision correct, the Board was not relieved of its affirmative obligation to ensure that school systems within the state be operated in accordance with the law. Several times after *Craggett*, the Board was apprised of racial inequities in the Cleveland school system. The Board cannot now claim that it ignored such information on the basis of an extremely narrow judicial opinion which had no bearing whatsoever on such segregative practices as intact busing, reduced school days, gerrymandering of school attendance zones, school closing, use of portable classrooms, and so forth. From the premise that the Cleveland Board was not guilty of segregative intent in building three neighborhood elementary schools, the conclusion that the Cleveland Public School System as a whole was not intentionally segregated was simply unwarranted, especially in light of the information which was constantly filtering through to the State Board.

As a factual matter, then, the contention of the State defendants is not supportable. Important information was made available to the State Board and Department of Education indicating the existence of intentional segregation in Cleveland. *See* pp. 416 420, *supra.* The defendants' claim that they did not "know" of such segregation appears to rest on the fact that they conducted no independent investigations and did not ascertain the accuracy of such information. Thus while they received information regarding segregative conduct from contacts with other government officials, collected data reports and protests and complaints of concerned parents, they did not "know" whether that conduct in fact existed.

The Court finds no support in law for the absolutist standard of "knowledge" relied upon by the State defendants. Upon being informed or advised of the existence of relevant facts, there can be no legal sanctuary for ignorance deliberately maintained.

D. The Motivation of the State Defendants in Failing to Investigate the Reasons for *De Facto* Segregation.

The State Board of Education and the Department of Education have been, and are, aware of the existence of many predominantly one race schools in large urban areas in the State of Ohio. (Tr. 600, 152). They were aware, as of 1970, that Cleveland was one of the ten school districts with the most racial isolation in the State of Ohio (Plaintiffs' Exhibit 379 [Trial]).

Despite knowledge of extensive *de facto* segregation in Ohio generally, and in Cleveland specifically, the State defendants did not undertake any investigation of the reasons for such segregation. Their justifications for this failure can be stated simply: *de facto* segregation is not violative of the Constitution (Tr. 601–602, 152–153), and no complaint was ever filed suggesting that illegal segregation existed in the Cleveland school district. (Tr. 277).

The Court rejects the defendants' contention that the absence of a formal complaint justifies the failure to conduct an investigation of segregation in Cleveland. The Pierce–Gaines presentation to the Board in 1970 clearly suggested the existence of illegal segregation in Cleveland and was intended to be a complaint. *See* pp. 418–420, *supra.* That this presentation was not considered a complaint is indicative of the use of discretionary procedural de-

vices to shelter the Board from knowledge, and therefore an obligation to act. In any case, other information made available to the State defendants suggested the existence of illegal segregation in Cleveland. *See* pp. 416–420, *supra.*

■ The State defendants' claim that *de facto* segregation was not investigated because it was considered lawful does not address the question of motivation. *De facto* segregation always has been, and continues to be, lawful. *Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189, 208, 93 S.Ct. 2686, 2697, 37 L.Ed.2d 548 (1973). Intentional racial segregation—*de jure* segregation–has been unlawful at least since the decision in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

The real question involves the State defendants' assumption that all segregation is considered *de facto,* unless proven otherwise. This assumption is merely a restatement of the assumption that all systems are operating lawfully in the area of race and is similarly unwarranted. Given the history of state mandated and permitted segregation, and the state defendants' knowledge that separate schools had been maintained unlawfully long after they were officially abolished, any assumption of legality is not supportable by history. Nor is this assumption supported by the fact that "neighborhood" schools have long been considered legal. *See Craggett v. Cleveland Board of Education,* 234 F.Supp. 381 (N.D.Ohio), aff'd, 338 F.2d 941 (6th Cir. 1964); *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 417–418, 97 S.Ct. 2766, 2774, 53 L.Ed.2d 85 (1977) (Dayton I). Without focusing on intent, the "neighborhood" label becomes a readily available means to segregate by race. *See Reed v. Rhodes, supra,* 422 F.Supp. at 790–92.

The failure of the State defendants to investigate *de facto* segregation ultimately appears to have been motivated by a desire to maintain the status quo. Instead of responding to duties imposed by state law and the federal constitution, the State Board and Department of Education chose to abdi-cate their responsibilities to insure equal protection of the laws.

**E. The "Incremental Segregative Effect" of the State Board's Action and Inaction.**

■ Had the State Board acknowledged its affirmative obligation under state and federal law to discover and eliminate local segregation, and had it exercised its power to withhold state monies from local segregated school systems or to dissolve and consolidate school districts, the likelihood is that the Cleveland Public School System would not have been in the sorry, segregated condition that this Court found it in 1976. While the notion of "incremental segregative effect" is not a mathematically precise one, this Court concludes that, had the State intervened at the appropriate time, the intentional segregation rampant within the Cleveland school system could have been eliminated "root and branch" many years ago. The State Board's continued torpidity in the face of clear evidence of *de jure* segregation of the Cleveland schools had the "incremental segregative effect" of allowing continued segregation where it need not have continued.

**V.**

■ The State Board's failure to take affirmative steps to eliminate or alleviate unconstitutional racial segregation in the Cleveland public school district, by itself, apparently does not support a finding of state liability under the Fourteenth Amendment. *Reed v. Rhodes, supra,* 607 F.2d at 716; *Penick v. Columbus Board of Education, supra,* 583 F.2d at 818. This is true even though the State of Ohio operating through the State Board of Education, is legally and primarily responsible for the maintenance and operation of public schools in Ohio, Ohio Const., Art. VI, § 3; Drury's Ohio School Guide, § 301, p. 25 (3d ed.), and the responsibility in the area of racial segregation has been clearly set forth and communicated to the Board. Attorney General's Opinion. Thus, the mere fact that the Board has "notice of its obligation to seek out, locate, and extirpate racial segregation in the public schools of Ohio", *Reed v.*

*Rhodes, supra,* 422 F.Supp. at 794, and knowingly fails to meet its obligation, is insufficient to impose liability on the State. *Arthur v. Nyquist,* 573 F.2d 134, 146–47 (2d Cir. 1978); *cf. Rizzo v. Goode,* 423 U.S. 362, 375–77, 96 S.Ct. 598, 606–607, 46 L.Ed.2d 561 (1976).

■ The failure of the State Board to take actions intended to eliminate segregation can, when combined with other facts, support a finding of constitutional violation, for "the Constitution can be violated by inaction as well as deeds." *Geier v. University of Tennessee,* 597 F.2d 1056, 1067 (6th Cir. 1979), *cert. denied,* 444 U.S. 886, 100 S.Ct. 180, 62 L.Ed.2d 117 (1979). *See Columbus Board of Education v. Penick, supra,* 443 U.S. at 449–50, 99 S.Ct. at 2941–2943. Thus, a state which initially compelled or authorized the creation of a local dual system of education has a continuing affirmative duty to eradicate all lingering effects of segregation; the neglect of that constitutional duty renders the State liable. *Geier, supra,* 597 F.2d at 1067; *United States v. Missouri,* 363 F.Supp. 739, 747 (E.D.Mo.1973), *aff'd in relevant part,* 515 F.2d 1365 (8th Cir.) (*en banc*) *cert. denied,* 423 U.S. 951, 96 S.Ct. 374, 46 L.Ed.2d 288 (1975). The Fourteenth Amendment requires "state officials . . . to take the necessary steps 'to eliminate from the public schools all vestiges of state imposed segregation'" *Milliken v. Bradley,* 433 U.S. 267, 289–90, 97 S.Ct. 2749, 2761–62, 53 L.Ed.2d 745 (1977) (citation omitted). Even if a State took no part in the creation of a local dual system of public education, it can be liable with local officials if it or its agents adhered to a deliberate policy of tolerating or supporting intentional racial segregation. *Norwood v. Harrison,* 413 U.S. 455, 463–67, 93 S.Ct. 2804, 2809–2811, 37 L.Ed.2d 723 (1973); *Reed v. Rhodes, supra,* 607 F.2d at 717–18. The rationale is set forth by the Supreme Court in *Cooper v. Aaron,* 358 U.S. 1, 19, 78 S.Ct. 1401, 1410, 3 L.Ed.2d 5 (1958):

> State support of segregated schools through any arrangement, management, funds, or property cannot be squared with the [Fourteenth] Amendment's command that no state shall deny to any person within its jurisdiction the equal protection of the laws.

■ This Court cannot conclude that the State of Ohio operated a state–wide racially dual system of public schooling at the time of *Brown v. Board of Education, supra.* Certainly State law after 1887 did not mandate that separate schools be maintained for black children. *Board of Education v. The State,* 45 Ohio St. 555, 16 N.E. 373 (1888). However, the mere repeal of the "Black laws" did not alter the fundamental policies and customs of significant numbers of local school boards and state officials. Local school boards continued to operate separate schools, and state officials showed no tendency to enforce the law despite knowledge of the existence of numerous separate schools for blacks throughout the State. Considering the historical background, the failure to demand compliance suggests a deliberate policy of refusing to enforce state law on behalf of a racial minority–a fundamental violation of the Fourteenth Amendment's guarantee of "equal protection of the laws".

A finding of state liability need not depend on the finding that the State of Ohio operated a state–wide dual system of education. Rather, knowledge by the state of intentional segregative practices by the local board and intentional support of the local board in pursuing such practices are sufficient to establish a constitutional violation. *Reed v. Rhodes, supra,* 607 F.2d at 717–18.

The evidence considered by this Court in the original liability trial and first remand opinion, combined with the testimony and exhibits produced during the most recent remand hearings, indicates that the State defendants had knowledge of serious racial problems in the Cleveland area. The State Board and Department also had knowledge of intentional segregative practices being pursued by the Cleveland Board of Education. This knowledge was derived from protests to the State Board by concerned parents, from data on the racial composition of faculty and students in school, and from

reports from, and discussions with, federal officials.

The assertion that ignorance of the *de jure* nature of segregation in Cleveland constitutes a valid defense cannot withstand careful scrutiny. The State Board cannot escape liability by seeking to erect the shelter of ignorance. "No State may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be." *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961). Time and again the State Board and Department of Education were exposed to information pointing specifically to the existence of *de jure* segregation in Cleveland. Yet time and again the State defendants deliberately chose not to pursue an investigation which might reveal additional facts which would constitute first hand knowledge and perhaps force them to make difficult desegregative decisions. In this regard, "it is difficult not to metaphorically refer to the State Board of Education as the proverbial ostrich with its head in the sand. Despite being virtually buried in an avalanche of data pointing up the severely segregated nature of the Cleveland schools, the Board steadfastly adhered to its do—nothing policy." *Reed v. Rhodes, supra*, 422 F.Supp. at 796.

Numerous factors indicate that despite substantial information regarding intentional segregative practices in Cleveland, the State Board of Education intentionally supported the Cleveland Board of Education in the pursuit of such practices.[2] The historical background is one of initial state-mandated segregation. Subsequently, local practice and state inaction permitted separate schools to continue in existence. Against this historical background and, in the face of information demonstrating the existence of *de jure* segregation, the Board failed to conduct any investigation to determine the cause of segregation in Cleveland or to ascertain the validity of complaints and reports of intentional segregation. This failure to investigate occurred even though the State defendants had been advised of their primary responsibility, "in the first instance," to insure conformity with law. The impact of the State Board's decision to decline to investigate was to permit acts of *de jure* segregation to continue. This inaction also permitted millions of dollars in state and federal funds to be utilized by the Cleveland defendants to operate their unconstitutional school system. The policies and practices of the State Board in structuring and enforcing their obligations concerning segregation were markedly different from policies pursued in other fields. Vigorous exercise of powers and duties in other educational areas distinguished the Board's general activities in establishing and enforcing minimum educational standards from the Board's inaction in racial matters.

The findings of intentional support and knowledge of segregative practices in the Cleveland public school district undergird this Court's conclusion that the State defendants are jointly liable for the creation and maintenance of illegally segregated public schools in the City of Cleveland.

Therefore, the State defendants are, along with the Cleveland defendants, responsible for implementing a remedy which will eliminate all vestiges of unconstitutional segregation in the Cleveland public school district.

At the very least, therefore, the State defendants must, except where statutes, legislation, or normal practice provide for a greater reimbursement, share jointly and severally in the cost of implementation of

---

**2.** *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), indicates that the following factors are relevant to determining intent

(i) The impact of the official action; .
(ii) The historical background of the decision;

(iii) The specific sequence of events leading to the particular decision, and, particularly, any departures from normal policy and practice;
(iv) The legislative or administrative history, particularly "contemporary statements by members of the decision-making body".

**426**

desegregation on a continuing basis, and must reimburse the local defendants for the State's share of desegregation–related expenses incurred so far. Future costs shall be shared by the State defendants as they are incurred, and not on a reimbursement basis, in order that the local defendants not be further unduly burdened with the total cost of implementation. However, as this Court noted in its Remedial Order of February 6, 1978, 455 F.Supp. 569, 607, the State's responsibility goes beyond giving financial aid. The Court reiterates that Order here:

The federal constitution requires that the State take an active part in dismantling the dual school system it has helped to create and replacing it with a unitary, integrated system. The Ohio constitution and state statutes make the State Board primarily responsible for educating students in a racially integrated manner. To insure State participation in the remedy process the Court orders the State Board to undertake a "positive action program" of the type described in the Special Master's Recommendations at 151, October 27, 1977:

The Special Master recommends that the Court gain assurances from the State defendants that a positive action program will be instituted to inspect and insure that all schools in the Cleveland District meet and maintain State Minimum Standards. Such a program should include reviewing test results and further devising and utilizing methods of ascertaining and assuring that students in the Cleveland School System are achieving in accordance with the grade level to which they have advanced in the Cleveland School System. The program should also include more positive investigation and more rigorous enforcement in regard to schools meeting and maintaining State Minimum Standards in regard to the physical and safety aspects of the educational environment. The program should further include more rigorous enforcement of State educational standards in regard to provisions of equal educational opportunities to minority students in a desegregated atmosphere in the Cleveland School System.

In addition, the State defendants are expected to continue to provide their expertise as necessary to aid the City defendants in carrying out the other aspects of this Order and such supplementary orders as will issue from time to time.

Should further remedial orders prove necessary, they will be forthcoming.

IT IS SO ORDERED.